# EXHIBIT 1

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

LONDON TOWN PIC LIMITED,
SOFIA SONDERVAN-BILD, and
TOM BUTTERFIELD,

       Plaintiffs,

                                   Case No. 20-5726-CA-01

v.

WELLS FARGO BANK, N.A.,
WELLS FARGO ADVISORS, LLC,

Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs London Town Pic Limited ("London Town"), Sofia Sondervan-Bild ("Sondervan") and Tom Butterfield ("Butterfield"), by their undersigned attorneys, sue Defendants Wells Fargo Bank. N.A. ("Wells Fargo Bank") and Wells Fargo Advisors, LLC ("Wells Fargo Advisors") (Wells Fargo Bank and Wells Fargo Advisors shall be collectively referred to as "Wells Fargo"), and alleges as follows:

### I.    STATEMENT OF THE CASE

1.    Plaintiffs bring this action alleging claims under the Florida RICO Act and for common law fraud and culpable negligence to recover damages caused by Defendants' brazen, widespread and well-calculated fraud. In short, Wells Fargo, through their employees, along with non-parties Weathervane Productions, Inc. ("Weathervane"), Forrest Capital Partners, Inc. and Forrest Capital and Co., LLC (Forrest Capital Partners, Inc. and Forrest Capital and Co., LLC shall be collectively referred to as "Forrest Capital"), spearheaded a fraudulent scheme to raise—and



EXHIBIT

2

then steal—funds from investors under the guise of an entirely illusory film financing scheme. Wells Fargo, Weathervane, and Forrest Capital lured Plaintiffs into their scheme by promising to provide financing for the production of their film London Town, a coming-of-age drama starring well-known actors Jonathan Rhys Meyers and Daniel Huttlestone.  But Wells Fargo, Weathervane, and Forrest Capital were only using Plaintiffs to steal more funds, leverage their credibility in the film industry, and use them as bait to draw other film production companies, investors and film financiers into its Ponzi scheme.

2.      Wells Fargo's instrumental role in the fraud and their guilt is wide-spread and undeniable—one of their employees, Benjamin Rafael, has already admitted to the fraud and has pled guilty to conspiracy to commit wire fraud in federal court.  Nor is this the first lawsuit brought by injured parties against Wells Fargo based on the same exact fraud.  In fact, Well Fargo has been sued for defrauding numerous other film producers and investors.  While, in the last several years, Wells Fargo has launched a new marketing campaign to re-establish trust with stakeholders as a result of what it admits was a "challenging period in its history," Wells Fargo's marketing is a sham.  Wells Fargo has shirked its responsibilities to defrauded film producers, investors and other innocent parties, as shown by Plaintiffs' own irrefutable allegations.

3.      Plaintiffs are compelled to file the instant action alleging claims for fraud and for RICO conspiracy in order for Wells Fargo to accept responsibility for its actions and the actions of its employees and agents, Rafael and others, and to pay Plaintiffs for the millions of dollars in damages Wells Fargo has caused them.

## II.      PARTIES, JURISDICTION AND VENUE

4.      This action is for damages in excess of the minimum jurisdictional requirements of this Court.



5.      Plaintiff London Town is a United Kingdom limited company that was engaged in the production, financing and distribution of films.

6.      Plaintiff Sondervan is an owner of London Town and a citizen and resident of New York.

7.      Plaintiff Butterfield is an owner of London Town and a citizen of the United Kingdom and legal resident of California.

8.      Defendant Wells Fargo Advisors is a Delaware limited liability company, with its principal place of business in Missouri, which has at least ten offices in South Florida.

9.      Upon information and belief, Wells Fargo Bank and Wells Fargo Advisors are affiliates of each other, which cross-sell their services to offer private banking, wealth management services and other financial services to high net worth clients.

10.      The Court has personal jurisdiction over Wells Fargo Bank and Wells Fargo Advisors because these entities are engaged in substantial and not isolated activity within Florida, operate, conduct, engage in and carry on a business in Florida, own, use, possess or hold a mortgage or other lien on real property within Florida and, moreover, committed tortious acts in Florida.

11.      Venue is proper in Miami-Dade County as the tortious acts alleged herein either occurred in Miami-Dade County, involved business transactions that occurred in Miami-Dade County and/or involved tortfeasor(s) that reside in Miami-Dade County.

## III.   FACTUAL BACKGROUND

12.      In the summer of 2013, Plaintiff Sondervan formed a United Kingdom limited company, Plaintiff London Town, as the entity through which to produce the film *London Town*, a coming-of-age drama featuring the music of the band The Clash and starring well-known actors

3



Jonathan Rhys Meyers and Daniel Huttlestone.  Plaintiff Sondervan later brought on Plaintiff Butterfield as her co-producer of *London Town* and co-owner of Plaintiff London Town.

13.     Based on their experience as film producers, Plaintiffs Sondervan and Butterfield knew that producing a film is expensive and requires substantial up-front funding.  In fact, as a general practice, once Plaintiffs Sondervan and Butterfield identiy and source a film project, they seek short-term bridge financing at the outset to begin production efforts.   Bridge funding is expensive, but necessary, because production requires that producers swiftly pay in-demand directors and actors up-front to secure commitment to a project.  These bridge loans finance early production costs until permanent financing structures can be finalized.

14.     Plaintiff Butterfield first became acquainted with Weathervane and Forrest Capital through his production of another film, which was theatrically released under the name *1 Mile to You*.  Weathervane and Forrest Capital, in conjunction with Wells Fargo, had provided what appeared to be a creative type of financing for that film.   Plaintiffs later learned that the financing arranged for *1 Mile to You* was part of the fraud—Wells Fargo, Weathervane, and Forrest Capital used the film as "bait" to lure other producers and investors into the scheme.

15.     The film financing scheme worked as follows: film investors would deposit money to be used towards film projects in a secure Wells Fargo account.  Weathervane and/or Forrest Capital were then supposed to match these investments by depositing additional funds in the same Wells Fargo account.

16.     Wells Fargo was responsible for managing the account and would then issue a line of credit to be used toward film projects, including purchasing scripts and sources, hiring talent and negotiating and structuring distribution rights.  The line of credit would be collateralized by the amounts supposedly held in the secure accounts.



BRODSKY FOTIU-WOJTOWICZ

17.     The investment scheme hinged on Wells Fargo holding funds in this secure account to collateralize lines of credit, which it then extended to finance films, so that initial investors would receive their principal along with returns on investment.

18.     Little did Plaintiffs know that the investment structure was a scam designed to induce investments so that the Wells Fargo, Weathervane and Forrest Capital could steal more than $50 million from investors.

19.     Believing them to be a legitimate source of financing, Plaintiffs pursued negotiations with Weathervane and Forrest Capital during 2014 and 2015 to provide financing for *London Town* using the funding structure described above, which was purportedly backed by Wells Fargo's line of credit.

20.     The agreements memorializing the financing of *London Town* were completed in June 2015 and July 2015.

21.     Under the first agreement, executed on June 22, 2015, Adana Investing, Inc. ("Adana"), a film financier, agreed to deposit $2.3 million into a Wells Fargo account for purposes of securing a line of credit for *London Town*.  Forrest Capital was to deposit a "matching" amount of $2.3 million into the Wells Fargo account, which would supposedly unlock the line of credit.

22.     Under the second agreement, dated July 16, 2015, another film financier, Vandermolen Film Co., Ltd. ("Vandermolen") agreed to loan Plaintiff London Town $1,794,000 to provide the film immediate cash to begin production.  Vandermolen was to be "taken out"— i.e., repaid—in short order once Plaintiff London Town received the line of credit secured by Adana's investment.   The Vandermolen loan was at high interest, but Plaintiffs were willing to agree to it based on their expectation that the line of credit would be coming shortly.

23.     Furthermore, as a condition of the Vandermolen loan, Plaintiffs Sondervan and



BFW
BRODSKY FOTIU-WOJTOWICZ

Butterfield agreed to defer their production fees until Vandermolen was paid back. Plaintiff also agreed to set aside a sum of money as a "contingency" that would not get released until Vandermolen was repaid. This contingency represented a large portion of the post-production budget, which was crucial to paying for the special effects, music licensing, and other elements of the film that would help make it a commercially successful project.

24.     In agreeing to this finance structure, Plaintiffs relied on the representations that Wells Fargo had made to Adana and Vandermolen regarding the legitimacy of the film financing scheme. Wells Fargo, Forrest Capital, and Weathervane not only intended for Adana and Vandermolen to rely on these representations, they also intended for Plaintiffs, the prospective borrowers under the bogus line of credit, to rely on them. Among these many representations made by Wells Fargo, on October 30, 2014, representatives of Adana and Vandermolen met with Weathervane and Forrest Capital at a branch of Wells Fargo Advisors in Fort Lauderdale. At the October 30, 2014 meeting, Paul Zoch, a Wells Fargo Advisors employee, detailed the film financing scheme, represented that it was to administered and overseen by Wells Fargo, and vouched for the legitimacy of Weathervane and Forrest Capital. On March 13, 2015, representatives of Adana and Vandermolen met with Weathervane and Forrest Capital at a branch of Wells Fargo Bank in the Brickell neighborhood of Miami. At the March 13, 2015 meeting, Benjamin Rafael, a Wells Fargo Bank employee, again detailed the film financing scheme, represented that it was to administered and overseen by Wells Fargo, and vouched for the legitimacy of Weathervane and Forrest Capital and their mutually beneficial relationship with the bank. Three days later, on March 16, 2015, at another meeting with Adana and Vandermolen representatives at the Brickell branch, Rafael again represented the safety and legitimacy of the film financing scheme. Additionally, on May 12, 2015 and June 18, 2015, Wells Fargo Bank



provided written letters to Adana supposedly confirming the legitimacy of the scheme by sending Adana a letter on Wells Fargo Bank letterhead, signed by Rafael, attesting that the "matching funds" provided by Adana would be held in a secure Wells Fargo Bank account. On June 2, 2015, Rafael sent Adana an email confirming that the funds it was putting up were being matched by Forrest Capital and were held in a secure account. The fraudulent misrepresentations of Wells Fargo's employees were carried out over a number of films and with a myriad of other innocent parties, and were part of a related and continuous pattern of defrauding investors and film producers.

25.     In fact, each of these representations, made by Wells Fargo's employees were knowingly false. The money provided by Adana for "matching" had not been held in a secure Wells Fargo account. Instead, as part of a criminal conspiracy they were stolen by Forrest Capital and Weathervane, who shared their ill-gotten proceeds with Wells Fargo's employees. This is not hyperbole. As part of his plea of guilty to criminal conspiracy, Rafael has admitted in federal court that his co-conspirators at Forrest Capital and Weathervane directed him, "in his capacity as a Wells Fargo Bank employee, to deceive victims about the security of their funds. During the course of the scheme, [Rafael] repeated and falsely assured victims often via interstate emails, that their contributions or loans had been "matched" and that [Forrest Capital and Weathervane] had applied for lines of credit as promised in the funding agreements . . . In addition, [Rafael] repeatedly told victims . . . that the funding agreement had been 'lodged' or recorded at Wells Fargo Bank, in order to falsely assure the victims that Wells Fargo Bank was a party to the bogus funding agreements or was otherwise bound by them.

26.     Wells Fargo was aware of their employees' fraudulent misconduct since as early as November 2014, when they were sued in another case involving the bogus financing scheme. Yet



they did nothing to stop the ongoing fraud which harmed Plaintiffs. Wells Fargo benefited from their employees' misrepresentations, and the subsequent deposits and transactions related to those misrepresentations through, among other things, the receipt of transactional fees, the increase in deposits on the Wells Fargo books, the receipt of interest income, an increase in overall lending capacity, and an increase to its minimum reserve requirements, all of which increased Wells Fargo's income and profits. At all times relevant to this action, Wells Fargo's employees fraudulent conduct occurred within the scope of their employment and was for the benefit of Wells Fargo.

27. Meanwhile, the film was shot in July of 2015. The fraudulent line of credit was supposed to be received during or slightly after filming was completed, in time for post-production work.

28. The timing of receiving this line of credit was crucial to the success of *London Town*. Once filming was complete, Plaintiffs had to move quickly to deliver a successful film to market. There were two crucial steps that Plaintiffs would need to take. First, Plaintiff London Town needed a third party to assist with production, postproduction and delivery of the film. Second, Plaintiff London Town needed a company to purchase the rights to the film and bring it to market.

29. But both steps were rendered virtually impossible due to Wells Fargo's fraud. Plaintiff London Town never received the fictitious line of credit that was supposedly secured by Adana's funds. As a result, Vandermolen was never "taken out" and its loan to Plaintiff London Town continued to accrue interest at a crippling rate. And Plaintiffs did not have access to the contingency funds that they had budgeted for post-production work.

30. Without this money, post-production stalled on *London Town.* When post-



production eventually resumed, it did so at slashed budget, ultimately resulting in a film lacking in the kind of special effects, coherent editing, and licensed musical accompaniment necessary to make it a commercial success.

31.     The inability to unlock the contingency, which was caused by Wells Fargo's fraud, prevented Plaintiff London Town from paying staff members and vendors.  This dramatically hindered the film's production and postproduction and, not surprisingly, deteriorated the quality of the film, causing harm to Plaintiffs' business and property.  A lesser film is worth less money.

32.     Moreover, Defendants' fraud, disappearing act, and the resulting lack of credibility to the film prevented Plaintiffs from closing financing from another lender to finish production, postproduction and delivery of the *London Town* film.

33.     The slip-shod version of the film was barely noticed when it was ultimately released. In light of the quality of the cast and script and its high expectations, the film was a commercial failure, which caused harm to Plaintiffs' business and property.

34.     And because Plaintiff London Town's loan from Vandermolen was accruing interest above and beyond what Plaintiffs had expected—as it was long supposed to have been replaced by the fraudulent line of credit that had more favorable terms—the production was put in a financially compromised position.  Indeed, Defendants' fraud created an environment in which the investors in the film felt the need to sell it to distributors for well below market value. The right distribution deal is not only crucial to recouping investors' money, but also vital to the success of a film at the box office and a clear indication of a film producers' value and worth in the marketplace.  Ultimately, the film was sold to distributors for well below market value, causing harm to Plaintiffs' business and property.

35.     Plaintiffs Sondervan and Butterfield were also individually harmed as they never

9



received the producer fees that they had agreed to hold back in expectation of receiving the bogus line of credit, causing harm to their business and property.

36. Lastly, the Defendants' fraud destroyed Plaintiffs Sondervan's and Butterfield's credibility as film producers. Prior to *London Town*, they had stellar reputations in the film industry and had found financial success and industry recognition with films such as *Cadillac Records*, *Party Monster*, and *Welcome to Me*.

37. Plaintiffs Sondervan's and Butterfield's reputation in the film industry has been grievously harmed by the fraudulent scheme and subsequent commercial failure of *London Town*. Though Plaintiffs Sondervan and Butterfield were the innocent victim of greed and deception, they are now known as the producer affiliated with the Defendants', Weathervane's and Forrest Capital's highly publicized fraudulent scheme, causing harm to their business and property.

38. Plaintiffs did not discover and could not have discovered with due diligence Wells Fargo's involvement in the fraud until, within the last four years, they learned that Vandermolen had sued Wells Fargo for their misconduct.

39. All conditions precedent to this action have occurred, been performed, or been waived.

### COUNT I – VIOLATION OF FLORIDA RICO ACT – FLORIDA STAT. § 772.103(3)
### (AGAINST WELLS FARGO BANK AND WELLS FARGO ADVISORS)

40. Plaintiffs reallege and incorporate by reference the allegations preceding the first count of the Amended Complaint as though fully set forth herein.

41. Defendants, along with Forrest Capital and Weathervane, conducted an associated in fact enterprise engaged in a pattern of racketeering activity through the fraudulent scheme alleged herein, including through their violations of Florida Statutes Chap. 812 and 817 and federal

10



wire fraud crimes, including.

42.     Defendants have formed an enterprise for the purpose of running a Ponzi scheme in which each played an important but distinct role; the enterprise has lasted long enough to allow Defendants to steal many millions of dollars.

43.     Plaintiffs have been factually and proximately injured in their business and property by reason of Defendants' numerous and manifold crimes.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants for treble damages, attorneys' fees, prejudgment and post-judgment interest, and award Plaintiffs such other and further relief as this Court may deem just and proper.

### COUNT II – VIOLATION OF FLORIDA RICO ACT – FLORIDA STAT. § 772.103(4)
### (AGAINST WELLS FARGO BANK AND WELLS FARGO ADVISORS)

44.     Plaintiffs reallege and incorporate by reference the allegations preceding the first count of the Amended Complaint as though fully set forth herein.

45.     Defendants, along with Forrest Capital and Weathervane, conspired to conduct an associated in fact enterprise engaged in a pattern of racketeering activity through the fraudulent scheme alleged herein, including through their violations of Florida Statutes Chap. 812 and 817 and federal wire fraud crimes, including.

46.     Defendants have formed an enterprise for the purpose of running a Ponzi scheme in which each played an important but distinct role; the enterprise has lasted long enough to allow Defendants to steal many millions of dollars.

47.     Plaintiffs have been factually and proximately injured in their business and property by reason of Defendants' numerous and manifold crimes.

11



WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants for treble damages, attorneys' fees, prejudgment and post-judgment interest, and award Plaintiffs such other and further relief as this Court may deem just and proper.

### COUNT III – FRAUDULENT MISREPRESENTATION
### (AGAINST WELLS FARGO BANK)

48.    Plaintiffs reallege and incorporate by reference the allegations preceding the first count of the Amended Complaint, as though fully set forth herein.

49.    At all times material hereto, Rafael was acting in the scope of his employment as a banker and for the benefit of Wells Fargo Bank.

50.    As described herein, Weathervane and Forrest Capital perpetrated a scheme to defraud a number of parties, including Plaintiffs.

51.    In furtherance of Weathervane's and Forrest Capital's scheme, Wells Fargo Bank, through Rafael, made materially false statements and representations, including, without limitation, those statements and representations described by and set forth above.

52.    All of the representations made by Rafael described by and set forth above were made directly or indirectly to Plaintiffs for the purposes of inducing reliance by Plaintiffs.

53.    Wells Fargo Bank, through Rafael, knew these statements were false and made such statements with intent to defraud.

54.    At all times material herein, Wells Fargo Bank and Rafael knew or should have known that Plaintiffs were relying upon the false representations made by Rafael to make key strategic decisions concerning production and distribution of the *London Town* film, including but not limited to decisions concerning funding of the *London Town* project.

12



55. Wells Fargo Bank, through Rafael, intended for Plaintiffs to act on the knowingly false representations described by and set forth above.

56. Plaintiffs justifiably relied to their detriment upon the statements and representations made by Wells Fargo Bank through Rafael.

57. Moreover, Wells Fargo Bank benefited from Rafael's misrepresentations, and the subsequent deposits and transactions related to those misrepresentations through, among other things, the receipt of transactional fees, the increase in deposits on the Wells Fargo Bank books, the receipt of interest income, an increase in overall lending capacity, and an increase to its minimum reserve requirements, all of which increased Wells Fargo Bank's income and profits.

58. As the direct and proximate result of Wells Fargo Bank, through Rafael, making the statements and representations described by and set forth above, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Wells Fargo Bank for damages, prejudgment and post-judgment interest, and award Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT IV – FRAUDULENT MISREPRESENTATION
### (AGAINST WELLS FARGO ADVISORS)

59. Plaintiffs reallege and incorporate by reference the allegations preceding the first count of the Amended Complaint as though fully set forth herein.

60. At all times material hereto, Zoch was acting in the scope of his employment as a Financial Advisor and Assistant Vice President for the benefit of Wells Fargo Advisors.

61. As described herein, Weathervane and Forrest Capital perpetrated a scheme to defraud a number of parties, including Plaintiffs.



62.     In furtherance of Weathervane's and Forrest Capital's scheme, Wells Fargo Advisors, through Zoch, made material false statements and representations, including, without limitation, those statements and representations described by and set forth above.

63.     All of the representations made by Zoch described by and set forth above were made directly or indirectly to Plaintiffs for the purposes of inducing reliance by Plaintiffs.

64.     Wells Fargo Advisors, through Zoch, knew these statements were false and made such statements with intent to defraud.

65.     At all times material herein, Wells Fargo Advisors and Zoch knew or should have known that Plaintiffs were relying upon the false representations made by Zoch to make key strategic decisions concerning production and distribution of the *London Town* film, including but not limited to decisions concerning funding of the *London Town* project.

66.     Wells Fargo Advisors, through Zoch, intended for Plaintiffs to act on the knowingly false representations described by and set forth above.

67.     Plaintiffs justifiably relied to their detriment upon the statements and representations made by Wells Fargo Advisors through Zoch.

68.     Moreover, Wells Fargo Advisors benefited from Zoch's misrepresentations, and the subsequent deposits and transactions related to those misrepresentations through, among other things, the receipt of transactional fees, the increase in deposits on the Wells Fargo Advisor books, the receipt of interest income, an increase in overall lending capacity, and an increase to its minimum reserve requirements, all of which increased Wells Fargo Advisors' income and profits.

69.     As the direct and proximate result of Wells Fargo Advisors, through Zoch, making the statements and representations described by and set forth above, Plaintiffs have suffered damages.

14



BRODSKY FOTIU-WOJTOWICZ

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Wells Fargo Advisors for damages, prejudgment and post-judgment interest, and award Plaintiffs such other and further relief as this Court may deem just and proper.

### COUNT V – NEGLIGENCE BASED UPON FIDUCIARY RELATIONSHIP BETWEEN VANDERMOLEN/ADANA AND PLAINTIFF LONDON TOWN (AGAINST WELLS FARGO BANK and WELLS FARGO ADVISORS)

70. Plaintiffs reallege and incorporate by reference the allegations preceding the first count of the Amended Complaint as though fully set forth herein.

71. As alleged herein, Defendants Wells Fargo Bank and Wells Fargo Advisors respectively employed Rafael and Zoch during the times relevant to this action.

72. As alleged herein, Rafael and Zoch, under the auspices of Wells Fargo Bank and/or Wells Fargo Advisors, facilitated and participated in Weathervane's and Forrest Capital's scheme to defraud several parties, including Vandermolen, Adana, and Plaintiff London Town.

73. In the course of perpetrating this scheme, Rafael and Zoch relied upon and utilized, among other things, Wells Fargo Bank's and/or Wells Fargo Advisors' domain and email addresses that were assigned to them, the technology infrastructure of Wells Fargo Bank and/or Wells Fargo Advisors, and the physical facilities and meeting spaces of Wells Fargo Bank and/or Wells Fargo Advisors.

74. In the course of perpetrating this scheme, Rafael and Zoch further utilized the access and information available to them by virtue of their employment and respective positions with Wells Fargo Bank and/or Wells Fargo Advisors, including access to bank accounts, the ability to open and manage new accounts, and the ability to market the cross-selling capabilities of Wells Fargo Bank and Wells Fargo Advisors.

75. Wells Fargo Bank and Wells Fargo Advisors maintained a customer relationship

15



with Adana and Vandermolen through the entire course of the events described herein.

76.     As agents of, and financing arrangers for Plaintiff London Town and members, Plaintiffs Sondervan and Butterfield, Adana and Vandermolen and their principals owed fiduciary duties to Plaintiffs.

77.     Wells Fargo Bank and Wells Fargo Advisors either knew or in the exercise of reasonable care should have known that Adana and Vandermolen were acting in a fiduciary capacity to Plaintiffs.  This knowledge was acquired within the course and scope of employment of Rafael and Zoch with Wells Fargo Bank and/or Wells Fargo Advisors.

78.     Wells Fargo Bank and Wells Fargo Advisors, by and through Rafael and Zoch, not only knew or should have known that Weathervane and Forrest Capital were engaged in a fraudulent scheme set up to induce filmmakers such as Plaintiffs to seek film financing and ultimately induce financiers to set up fake credit lines at Wells Fargo Bank and/or Wells Fargo Advisors but, even more, Wells Fargo Bank and Wells Fargo Advisors personally benefited from this scheme.

79.     Wells Fargo Bank and Wells Fargo Advisors have a duty to monitor and supervise their employees, enforce their internal security policies and otherwise comply with applicable banking and financial regulations for the purpose of, among other things, protecting the integrity and security of their banking and other financial businesses.

80.     Wells Fargo Bank and Wells Fargo advisors breached their duties of care by, among other things: (1) failing to monitor the email accounts of Rafael and Zoch; (2) failing to timely close and/or monitor the email accounts of Rafael and Zoch after they were terminated; (3) failing to monitor the insider transactions, including those of Rafael and Zoch, that involved the transfer of Wells Fargo Bank's and/or Wells Fargo Advisors' customers' funds into Wells Fargo Bank's

16



BRODSKY FOTIU-WOJTOWICZ

and/or Wells Fargo Advisors' employees' personal accounts at Wells Fargo Bank; and (4) failing to adhere to industry-standard "Know Your Customer" compliance procedures, thereby allowing Weathervane and Forrest Capital to use the Wells Fargo Bank's and/or Wells Fargo Advisors' banking and financial facilities and platforms to perpetrate fraud.

81. Even after Wells Fargo Bank terminated Rafael, Wells Fargo Bank failed to disable his email address, failed to produce an auto-reply to notify those in communication with him that he no longer worked at Wells Fargo Bank, and continued to allow Rafael to represent himself as a management level employee of Wells Fargo Bank.

82. As a result of Wells Fargo Bank and Wells Fargo Advisors breaching their duties of care, Plaintiffs, have suffered damages, as described herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Wells Fargo Bank and Wells Fargo Advisors for damages, prejudgment and post-judgment interest, and award Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT VI – NEGLIGENT SUPERVISION
### (WELLS FARGO BANK)

83. Plaintiffs reallege and incorporate by reference the allegations preceding the first count of the Amended Complaint as though fully set forth herein.

84. Defendant Wells Fargo Bank employed Rafael at all times relevant to this action.

85. At all times relevant to this action, Defendant Wells Fargo Bank owed Plaintiffs a duty of reasonable care to supervise Rafael's employment.

86. As alleged herein, Rafael, under the auspices of Wells Fargo Bank, facilitated and participated in Weathervane's and Forrest Capital's scheme to defraud several parties, including

17



BRODSKY FOTIU-WOJTOWICZ

Adana, Vandermolen, and Plaintiffs.

87.     In the course of perpetrating this scheme, Rafael relied upon and utilized, among other things, Wells Fargo Bank's domain and email addresses that were assigned to him, the technology infrastructure of Wells Fargo Bank, and the physical facilities and meeting spaces of Wells Fargo Bank.

88.     In the course of perpetrating this scheme, Rafael further utilized the access and information available to his by virtue of their employment and respective positions with Wells Fargo Bank, including access to bank accounts, the ability to open and manage new accounts, and the ability to market the cross-selling capabilities of Wells Fargo Bank and the ability to identify customers of Wells Fargo Bank.

89.     Because Rafael used Wells Fargo Bank's computer systems, technology infrastructure, and physical locations on a repeated and systematic basis, as set forth herein, Wells Fargo Bank knew or should have known that Rafael was working together with Weathervane and Forrest Capital to carry out a far-reaching fraudulent scheme set up to induce filmmakers such as Plaintiffs to seek film financing and ultimately induce financiers to set up fake credit lines at Wells Fargo Bank and/or Wells Fargo Advisors.

90.     Even worse, Wells Fargo Bank personally benefited from this scheme.

91.     Wells Fargo Bank has a duty to monitor and supervise their employees, enforce their internal security policies and otherwise comply with applicable banking and financial regulations for the purpose of, among other things, protecting the integrity and security of their banking and other financial businesses.

92.     Wells Fargo Bank breached its duty of care by, among other things: (1) failing to monitor the email accounts of Rafael; (2) failing to timely close and/or monitor the email accounts



of Rafael after he was terminated; (3) failing to monitor the insider transactions, including those of Rafael, that involved the transfer of Wells Fargo Bank's and/or Wells Fargo Advisors' customers' funds into Wells Fargo Bank's and/or Wells Fargo Advisors' employees' personal accounts at Wells Fargo Bank; and (4) failing to adhere to industry-standard "Know Your Customer" compliance procedures, thereby allowing Weathervane and Forrest Capital to use the Wells Fargo Bank's banking and financial facilities and platforms to perpetrate fraud.

93.     Even after Wells Fargo Bank terminated Rafael, Wells Fargo Bank failed to disable his email address, failed to produce an auto-reply to notify those in communication with him that he no longer worked at Wells Fargo Bank, and continued to allow Rafael to represent himself as a management level employee of Wells Fargo Bank.

94.     As a result of Wells Fargo Bank and breaching its duty of care, Plaintiffs have suffered damages, as described herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Wells Fargo Bank for damages, prejudgment and post-judgment interest, and award Plaintiffs such other and further relief as this Court may deem just and proper.

## COUNT VII – NEGLIGENT RETENTION
### (WELLS FARGO BANK)

95.     Plaintiffs reallege and incorporate by reference the allegations preceding the first count of the Amended Complaint as though fully set forth herein.

96.     At all times relevant to this action, Defendant Wells Fargo Bank owed Plaintiffs a duty of reasonable care to supervise Rafael's employment.

97.     Defendant Wells Fargo Bank employed Rafael at all times relevant to this action.

98.     As alleged herein, Rafael, under the auspices of Wells Fargo Bank, facilitated and



participated in Weathervane's and Forrest Capital's scheme to defraud several parties, including Adana, Vandermolen, and Plaintiffs.

99.    In the course of perpetrating this scheme, Rafael relied upon and utilized, among other things, Wells Fargo Bank's domain and email addresses that were assigned to him, the technology infrastructure of Wells Fargo Bank, and the physical facilities and meeting spaces of Wells Fargo Bank.

100.    In the course of perpetrating this scheme, Rafael further utilized the access and information available to them by virtue of their employment and respective positions with Wells Fargo Bank, including access to bank accounts, the ability to open and manage new accounts, and the ability to market the cross-selling capabilities of Wells Fargo Bank and the ability to identify customers of Wells Fargo Bank.

101.    Because Rafael used Wells Fargo Bank's computer systems, technology infrastructure, and physical locations on a repeated and systematic basis, as set forth herein, Wells Fargo Bank knew or should have known that Rafael was working together with Weathervane and Forrest Capital to carry out a far-reaching fraudulent scheme set up to induce filmmakers such as Plaintiffs to seek film financing and ultimately induce financiers to set up fake credit lines at Wells Fargo Bank and/or Wells Fargo Advisors.

102.    Even worse, Wells Fargo Bank personally benefited from this scheme.

103.    At some time prior to April 2015, Wells Fargo Bank began investigating Rafael's use of Wells Fargo Bank's and Wells Fargo Advisors' computer systems, technology infrastructure and physical locations to carry out widespread fraud.

104.    Nonetheless, Wells Fargo Bank made no attempt to advise Plaintiffs of the ongoing investigation.

20



BRODSKY FOTIU-WOJTOWICZ

105.     Wells Fargo also failed to terminate Rafael until approximately June 19, 2015, thereby allowing Rafael to continue his fraudulent scheme – to the detriment of Plaintiffs – with full knowledge of the ongoing fraud.

106.     By failing to notify Plaintiffs of Rafael's misconduct and by retaining Rafael without justification until approximately June 19, 2015, Wells Fargo Bank allowed Rafael to continue his fraud to the detriment of Plaintiffs.

107.     Accordingly, Wells Fargo Bank breached its duty of care to Plaintiffs by negligently retaining Rafael.

108.     As a result of Wells Fargo Bank and breaching its duty of care, Plaintiffs have suffered damages, as described herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Wells Fargo Bank for damages, prejudgment and post-judgment interest, and award Plaintiffs such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated:  March 31, 2020

Respectfully submitted,

By: *Benjamin H. Brodsky*
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
Joshua Truppman, Esq.
Florida Bar No. 111795
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiff*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel:  305-503-5054

21

BFW

BRODSKY FOTIU-WOJTOWICZ

bbrodsky@bfwlegal.com
joshua@bfwlegal.com
docketing@bfwlegal.com

**CERTIFICATE OF SERVICE**

I certify that the foregoing document has been furnished by the Florida Courts e-filing Portal pursuant to Fla. R. Jud. Admin. 2.516(b)(1) and email, this **31st day of March, 2020**, to the following:

Jarrod D. Shaw, Esq.
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
jshaw@mcguirewoods.com

Mark W. Kinghorn, Esq.
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
mkinghorn@mcguirewoods.com

By: _/s/ *Benjamin H. Brodsky*_
Benjamin H. Brodsky, Esq.

BFW

BRODSKY FOTIU-WOJTOWICZ