# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: 20-21536-Civ-COOKE/GOODMAN

LONDON TOWN PIC LIMITED,
et al.,

          Plaintiffs,

 vs.

WELLS FARGO BANK, N.A.,
WELLS FARGO ADVISORS, LLC,

          Defendants.

_____

VIDEOTAPED RULE 30(B)(6) DEPOSITION OF
LONDON TOWN PIC LIMITED
THOMAS BUTTERFIELD

Taken on Behalf of the Defendants

DATE TAKEN:    Wednesday, September 23, 2020

TIME:          11:35 a.m. - 4:25 p.m. EST

LOCATION:      Via Videoconference

Examination of the witness taken stenographically
before:

Matthew McKinney, FPR



THE WITNESS:  So in the end, the way that it worked was that we raised half of the production budget through equity sources.  There were a number of them.  And in return, we matched that equity with WeatherVane in a dollar-for-dollar match that created the total budget.

BY MR. SHAW:

Q.    Okay.  And what was the total budget?

A.    It was about 3.2.

Q.    Okay.  So roughly half of that was procured through equity sources, so would that be individuals, for example, who would put money into the movie?

A.    Correct.

Q.    Okay.  And then the other half was, you said, a dollar-for-dollar match that you procured through WeatherVane?

A.    That was the intention.  That's not what happened, but that was the intention.

Q.    Okay.  What did happen?

A.    The match took place.  We brought in an investor called Vandermolen, and their financial source called Adana made the match with WeatherVane.  We took a bridge loan from Vandermolen to be able to go into production, and that bridge loan actually ended up replacing WeatherVane's money because it never arrived.



Q.   Okay.  But you -- the film itself did enter into an agreement with WeatherVane to procure funds; correct?

A.   Correct.

Q.   Okay.  But that agreement was never met by WeatherVane in that they never came through with their funds; correct?

MR. BRODSKY:  Objection.

A.   Yeah.

Q.   Okay.  Was that a yes?

A.   One second.  I'm just going to close my door. I can hear my little ones outside.

Q.   Sure.

A.   Thank you.

Q.   Yep.  Okay.  WeatherVane never came through with the funding that it promised; correct?

A.   That's correct.

Q.   Okay.  Have you ever provided testimony in a proceeding, court hearing before?

A.   No.

Q.   Okay.  I should have said earlier: Mr. Brodsky may, from time to time, object to my questions.  Unless he instructs you not to answer, I'll ask you to answer the question or I may reframe my question.  Okay?



A.   He had mentioned various Wells Fargo branches, I believe at least a couple.  I know one was offsite.  I don't know exactly where.

Q.   Okay.  Did he tell you who attended those meetings?

A.   Yes.  He had met with a gentleman called Benjamin Rafael from Wells Fargo Bank, at at least one.  And he mentioned a gentleman called Paul Zoch, I think is how you pronounce his name, from Wells Fargo Advisors, at at least another.

Q.   And he told you those names in the spring of 2015?

A.   Yeah, correct.  I was aware of Benjamin Rafael's name previous to that.

Q.   How did you know Benjamin Rafael's name previous to that?

A.   Well, so WeatherVane had financed a film of mine called -- originally it was called Life at These Speeds, but then it became called 1 Mile to You.

Q.   And was Mr. Rafael -- how was Mr. Rafael's name associated with the 1 Mile to You film?

A.   He was the, quote, unquote, Wells Fargo representative.

Q.   Had you ever spoken to Mr. Rafael?

A.   I don't believe I ever spoke to him on the



phone, although I could be wrong, but he was a part of e-mail chains.  I've never physically met him in my life.

Q.   Do you still have those e-mails?

A.   Yes, I believe I turned what I could find over.  I could still have more.  I would need to check.

Q.   Okay.  And to the best of your recollection, what did those e-mails say?

A.   That he was involved with?  They would have been discussing the match process for 1 Mile to You, that the match was taking place.  We had multiple issues with monies not arriving on time, so he would have been part of conversations between production and WeatherVane in terms of when the money was arriving.  Those would probably be the primary ones.

Q.   There were delays associated with the arrival of funds in connection with that film?

A.   To 1 Mile to You?  Yes, correct.

Q.   Okay.  Explain for me what were those delays.

A.   So the way that we were told the WeatherVane model worked was it took between 30 and 60 days for the match to occur and the line of credit to become available.  Those timelines got extended, and we had already started production, so we were trying to scramble and find ways of making up for that -- making



up for that money, and actually we took a small bridge loan from Alastair Burlingham to see it through.

Q.   Did the money ever come through from WeatherVane?

A.   It did.

Q.   When?

A.   I believe we got it all probably either the very end of 2014 or beginning of 2015.  I think we got -- we shot the movie around Thanksgiving of 2014.

Q.   Okay.  But you began to shoot the movie before the financing from WeatherVane came in; correct?

A.   Correct.

Q.   Okay.  So that money may have come in, in the beginning of 2015?

A.   The WeatherVane money?  Yeah, correct.

Q.   Did all of the money come in?

A.   To my knowledge, yeah.

Q.   Okay.  Did the delay in the money cause the film any damages?

A.   It caused us some fiscal damages, yes.  We took on a bridge loan we hadn't anticipated, which took money from our contingency, but we were able to complete the film.

Q.   And how much did it cost out of the contingency?



800.211.DEPO (3376)
EsquireSolutions.com

Mr. Van Eman specifically, I'll do that, but it's easier just to collectively refer to them as WeatherVane.

A.    Understood.

Q.    When did you first become acquainted with WeatherVane?

A.    I honestly don't know the answer to that, to when I first met them.  It would have been probably in 2000- -- end of 2012, maybe.  I've been racking my brain to answer that question.  I can't remember exactly.

Q.    Okay.  To the best of your recollection, you think it was the end of 2012?

A.    I think so.

Q.    Okay.  And I understand and I appreciate that.  To the extent that you don't know but you are estimating or taking an educated guess, just let me know that.

Okay?

A.    Understood.

Q.    Okay.  And to the best of your recollection, how did you come to be acquainted with WeatherVane?

A.    Excuse me.

I believe it was through -- honestly, I can't remember.  I don't want to mislead.  I can't remember.

Q.    Okay.  You testified earlier you worked with WeatherVane on the Life at These Speeds film?



A.   Correct.

Q.   Was that the first time you had worked with WeatherVane?

A.   Yes.

Q.   Okay.   Other than with respect to the film London Town, have you ever worked with WeatherVane on any other film?

A.   Tried to.

Q.   Okay.   What film was that?

A.   There were a couple.   There was a film called 47 Meters Down.   There was a film called Antibirth. There was a film called Grief Camp.

Q.   The 47 Meters Down film, the one with Mandy Moore that got made, is that the one we're talking about?

A.   Yeah.

Q.   Were you a producer on that film?

A.   No.   I was going to be -- if WeatherVane had delivered, I was going to get an EP credit and I was going to get fees associated.

Q.   WeatherVane did not deliver on that film?

A.   They did not.

Q.   And when was that?

MR. BRODSKY:   Objection to the form.

BY MR. SHAW:



LONDON TOWN PIC LIMITED 30B6
LONDON TOWN PIC vs WELLS FARGO BANK

September 23, 2020
45

Q.   And let me rephrase that.

When did you first begin to work on the 47 Meters film in an effort to try and get funding through WeatherVane?

A.   That would have been 2015.

Q.   Was it before or after you had entered -- London Town had entered into an agreement with WeatherVane for financing?

A.   After.

Q.   Okay.  What about Antibirth, did you work with WeatherVane on Antibirth?

A.   Again, tried to.

Q.   Did WeatherVane come through with financing on Antibirth?

A.   To my recollection, no.

Q.   Okay.  Did anti -- did the film Antibirth enter into an agreement with WeatherVane for financing?

A.   I don't know the answer to that question.

Q.   Okay.  What timeframe were you working to try and get WeatherVane to provide financing for the film Antibirth?

A.   What timeframe?

Q.   Yes.

A.   As in how many months or when in the calendar year?



Okay?

A.   Okay.

Q.   All right.  Of course, if you want to read these before I start asking questions, just say so.

A.   Yes, please, if you can just give me a quick sec.

Q.   Certainly.  Just give me an "I'm done."

A.   Yeah, sure.

Yeah, okay.

Q.   Okay.  So first, it says, "Hi, Sofia.  Okay.  After having spent a week on calls with a matching fund" -- I'm going to stop there.

What is the matching fund you're referring to?

A.   That would have been WeatherVane.

Q.   Okay.  "And having my lawyers in New York do due diligence on them," okay.  Do you see that?

A.   I do.

Q.   Okay.  Is it accurate that you had your lawyers in New York do due diligence on WeatherVane?

A.   I don't recall.

Q.   Okay.  Have you ever had lawyers in New York?

A.   I have.

Q.   Okay.  Who were they?

A.   My uncle, Tony Butterfield.  He at the time -- at this time he would have been a litigator for FKKS,



Frankfurt, Klein and whatever -- I can't remember the last name.

Q.   Have you ever had FKKS do work for you?

A.   I have.

Q.   Okay.  Were they doing work for you in the summer of 2014?

A.   I don't recall.

Q.   Do you recall retaining them to conduct due diligence on WeatherVane?

A.   I don't recall.

Q.   Would you have told Ms. Sondervan-Bild that you had your lawyers in New York do due diligence if that wasn't, in fact, true?

A.   I don't recall.

Q.   A little different question.  Would you have told her that you had your lawyers in New York do due diligence on a company if that was not, in fact, true?

MR. BRODSKY:  Objection to the form.

A.   I don't believe so.

Q.   Okay.  So to the extent that you said it in 2014, it's your position today that it would have been accurate when you said it?

MR. BRODSKY:  Objection to the form.

A.   Yeah.

Q.   Okay.  You would not have lied to



Ms. Sondervan-Bild about this; correct?

A. Correct.

Q. Do you recall -- so sitting here today, however, you do not recall retaining lawyers in New York to do due diligence?

MR. BRODSKY: Objection to the form.

A. That's correct.

Q. Okay. Do you recall lawyers -- strike that.

Do you recall anyone telling you that, quote, "They are happy for me to go ahead and suggest them as a legit financing option for my projects," end quote?

A. Can you -- sorry. Can you ask the question again?

Q. Yes. Do you recall anyone telling you -- or strike that.

It says here, "I have been told that they are happy for me to go ahead and suggest them as a legit financing option for my projects." Do you see that?

A. I do.

Q. Who told you that?

A. I don't recall.

Q. Okay. Do you have any reason to think that what you stated in this e-mail was inaccurate?

MR. BRODSKY: Objection to the form.

A. Was inaccurate?



Q.   Yes.

A.   No.  I believe it was accurate.

Q.   Okay.  Do you believe you were referring to your lawyers in New York who do due diligence --

MR. BRODSKY:  Objection --

BY MR. SHAW:

Q.   -- let me finish before you object, please -- as the one to have told you that they were happy for you to go ahead and suggest them as a legit financing option for my project?

MR. BRODSKY:  Objection to the form.

A.   As I've written -- yeah, as I've written this e-mail, that would make sense.

Q.   Okay.  Sitting here today, do you believe WeatherVane to be a legit financing option?

A.   As of this moment, no, they're not.

Q.   Okay.  Have you ever raised that issue with the lawyers in New York who did the due diligence?

MR. BRODSKY:  Tom, don't disclose communications you had with your counsel.

A.   I can't answer that question.

Q.   You go on to say, "I want to put London Town in front of them, as it fits well within their remit."

Do you mean that you want to put London Town in front of WeatherVane?



A.   Yes.

Q.   Okay.  When you received this e-mail with the attached letter, did you ever contact Wells Fargo directly to confirm the accuracy of this letter?

A.   I did not.  I didn't feel it necessary.

Q.   Did you understand that the funds supposedly placed in the account at Wells Fargo -- strike that.

Were there any conditions to your understanding, as to the funds placed in the account at Wells Fargo, as to whether or not they could be withdrawn?

MR. BRODSKY:  Objection to the form.

A.   My understanding was that there were multiple signatures on the account that have to be obtained in order to release anything.  I believe it was -- we would have to double-check, because I think it's in the Adana funding agreement.  But, yes, there were multiple signatures that would have to be taken -- that would have to happen before monies could be moved.

Q.   Did -- did there come a point in time when Mr. Van Eman breached the financier term sheet?

A.   Yes.  The money never arrived.

Q.   Okay.  And did London Town Pic notify Mr. Van Eman of the breach of the financier term sheet?

A.   Yes, I believe we did through our lawyer.



Q.    Through your legal counsel?  Okay.

And I'm going to show you what was marked as Exhibit 11.  And is this that notification of material breach that was sent by London Town Pic's lawyer to Mr. Van Eman?

A.    It looks like it, yeah.

Q.    And this was sent in November 2015; correct?

A.    Yeah.

Q.    At the time that this letter was sent, were you aware of any litigation that had been filed against WeatherVane?

A.    Well, yes.  You know that I know that people had tried to sue them previously.  I've already answered that.  I've said yes to that question.

Q.    My question's a little different.  As of November 20th, 2015, you knew that litigation had been initiated against WeatherVane; correct?

A.    Yes.  As I said before, with my e-mail exchange with Jason Garrett, obviously I've known that someone had tried to sue WeatherVane.

Q.    And that was the e-mail with Jason Garrett that was in January 2015; correct?

A.    Yeah.

Q.    What about any other litigation?

A.    To my knowledge, between that time and this



notification, no.

Q.   What about Adana, had Adana to your knowledge sued WeatherVane as of November 20th, 2015?

A.   I -- yes.  Adana would have been after them around that time.

Q.   Okay.

A.   And to be clear, Adana -- by that, I mean after WeatherVane specifically.

Q.   What about any other lawsuits that had been initiated against WeatherVane as of November 20th, 2015?

A.   Not to my knowledge.

Q.   Were you aware of any lawsuits that had been initiated against Wells Fargo in connection with WeatherVane's representations regarding Wells Fargo as of November 20th, 2015?

MR. BRODSKY:  Objection to the form.

A.   No.

Q.   Did you ever hear of an entity -- or generally heard the name Buzzbee?

A.   Buzzbee?

Q.   Uh-huh.

A.   That's an entity?

Q.   Does that name ring a bell for you?

A.   Not off the top of my head, no.

Q.   Okay.  At the time that London Town Pic had



him.

Q.   Okay.  Do you ever recall asking him why the money was not being provided, given that you had seen a letter from Wells Fargo letterhead indicating that the matching funds had been procured?

A.   I'm sure I did.

Q.   And what was his response?

A.   There was always an excuse.  Generally -- there was a phrase he used, and I'll see if I can remember it.  "Compliance" was a word he used.  They were having to deal with compliance issues at the bank and that was holding up the release.  It was always something to do with compliance.

Q.   So he was blaming it on the bank that the funds had not been released?

A.   That's correct.

Q.   Okay.  Was that the excuse he gave you in or around November 2015, when you were having this e-mail exchange and these conversations?

A.   I'm sure it was.

Q.   Okay.

A.   Something to that effect.

Q.   I'm going to focus here, "As I said on the phone, the first month of additional fees (that was originally a WV cost) now means that we no longer have



enough funds to deliver the film if Alastair insists on repayment, which we both know he will."

Do you see that?

A.   I do.

Q.   London Town was able to deliver the film, though; correct?

A.   We did, yes.

Q.   And Alastair did insist on repayment; correct?

A.   100 percent.

Q.   Did Mr. Van Eman tell you -- or make representations to you as to when the money was going to be released after you sent -- after you sent the material breach notice?

A.   Yes.  I mean, as it says in this e-mail, clearly on the phone which I then followed up in this e-mail, that we were expecting it around the beginning of December.

Q.   Okay.  Did it come in the beginning of December?

A.   I'm sorry.  Say that again.

Q.   Did the money come at the beginning of December?

A.   No, it did not.

Q.   Did he make representations to you as to why the money didn't come at the beginning of December?



A.   I don't recall.  But again, similar to my answer before, it would probably have been some sort of excuse regarding compliance.

Q.   I'm going to show you what we will mark as Exhibit 22, which is in that subfolder, Ben, tab 6.  For the record, marking as Exhibit 22 LT9063 through LT9066.

(Defendants' Exhibit 22 marked.)

And I'm happy to have you read through this. You can start at the bottom, if you want.

A.   Sure.

Q.   Let me know when you want me to scroll.

A.   Yes, please.

Okay.

Yep, okay.

Okay.

Okay.

Q.   I'll start us on the first chain here.  This is an e-mail from you to Mr. Van Eman; right?

A.   Yes, correct.

Q.   Okay.  And you -- some of these are a little off format-wise, but it looks like you copied Ross Marroso on there?

A.   Yes, that looks right.

Q.   And this is December 1, 2015, at or around the time that Mr. Van Eman represented to you that the



delayed funding would come through?

A.   Correct.

Q.   Was this similar to the situation that you had encountered with Life at These Speeds, with delayed funds coming through?

MR. BRODSKY:   Objection to the form.

A.   Yes.

Q.   Okay.   Were you concerned that now, in a second deal, that history was repeating itself?

A.   Yes, I think that's fair to say.

Q.   So from -- it says, "I wanted to check in. From previous conversation, it was clear that today was a D-day on negotiations."

Do you see that?

A.   I do.

Q.   Okay.   What did you mean by "D-day on negotiations"?

A.   I meant that he was supposed to have told me December 1 when the money was arriving.   That would be my assumption.

Q.   And arriving for the film London Town?

A.   I assume it means for London Town.   Possibly I meant Grief Camp and 47 Meters Down as well.

Q.   Okay.   And you were involved, right, both with Grief Camp and 47 Meters Down?



A.   As I mentioned, yeah, as executive producer. I subsequently -- because of WeatherVane not turning up, I didn't get a credit or the fees or anything on 47 Meters Down.

Q.   Do you know if WeatherVane -- does this e-mail refresh your recollection as to whether WeatherVane entered into agreements with Grief Camp to provide funding?

A.   Again, I'm not sure that it does.  It could still have been a verbal conversation.  I don't know if they'd actually given them LOIs or anything at that point.

Q.   Same question with respect to 47 Meters Down.

A.   Well, I think if you see through the e-mail chain that they were expecting to get paperwork from Jason but never -- but hadn't received it.

Q.   Okay.  Mr. Van Eman responds the same day, "47D is getting a formal letter from us today with the dates of funding and" -- and I do not know what that's supposed to mean -- "guessing the" --

A.   I think --

Q.   Pardon?

A.   I think it was "and all."  I think it was a double L.

Q.   Thank you.  "Guessing the 15th to the 18th



would feel about right."  Okay.

So does this mean that 47 Meters Down had entered into an agreement to receive funding from WeatherVane?

MR. BRODSKY:  Objection to the form.

A.   No.  It means that he was sending a letter to them that day.  It doesn't state that he already had.

Q.   Okay.  Then you're e-mailing -- it's unclear who you're e-mailing.  You're writing, "Please see below that I just received from Jason.  Can you confirm that you received this formal letter?  As I'm speaking to him a couple times a day for updates, I want to make sure he's doing what he's saying in his correspondence."

Do you know who you were writing to?

A.   Yeah.  That would have been either David Gilberry and/or Wayne from a company called Fyzz.

Q.   And what was Fyzz's involvement with 47 Meters Down?

A.   They were producers and partial financiers.

Q.   Okay.  And David Gilberry writes back, "Just as an FYI, as WeatherVane missed their funding date. The production issued them a formal notice of default on Friday with a cure period that expired today, so we are now speaking with our investor to determine whether or not he wishes to terminate the WeatherVane agreement."



Do you see that?

A.   I do.

Q.   Okay.  Does that refresh your recollection as to 47 Meters Down having entered into an agreement with WeatherVane?

A.   Again, if David says he received it, then I guess he had.

Q.   Okay.  You respond, "Understood.  I am sorry to say that it all appears to have come crashing down with WeatherVane."

What did you mean by "appears to have come crashing down with WeatherVane"?

A.   They -- clearly they weren't hitting the dates they said in terms of providing funding.

Q.   And then you go on to say, "I have two other projects as well as 47 Meters Down that we have done the same notice on."

Do you see that?

A.   I do.

Q.   And is that project the -- Grief Camp was one of those projects?

A.   I am not sure.  I mean, one of them would have been London Town.  The other one, it could have been Grief Camp.  I couldn't say specifically.

Q.   Okay.  But there was at least one other



project where an agreement had been entered into and breached by Mr. -- by WeatherVane, where the project had to give the same notice?

A.   Yes, if that's what I said.

Q.   Okay.   And then Mr. Godfrey responds -- does Mr. Godfrey work with Mr. Gilberry?

A.   Yes.   So Wayne Godfrey was the former CEO of The Fyzz, and David was his either CFO or business affairs.   I can't remember his exact title.

Q.   Okay.   And then he responds, "Unless they fund in the next two hours, this is dead."

Do you see that?

A.   I do.

Q.   And did WeatherVane fund in the next two hours?

A.   They did not.

Q.   And was the project dead?

A.   No.   The project went on --

Q.   Let me rephrase that question.   Was the deal with WeatherVane dead?

A.   Yes, it was.

Q.   Okay.   And did that cause you damage as a result of 47 Meters Down not moving forward with WeatherVane?

A.   It did.



Q.   Okay.  Can you quantify the amount?

A.   I would need to double-check my agreement, but I believe I had an EP fee which I never received, and I also had a small net profit participation.  The film actually went on to be commercially very successful.  Over -- I can't remember the exact amount, but I believe it was over $14 million in box office.

Q.   Okay.  And did you continue, after December 1st, 2015, to follow up with Mr. Van Eman to ask whether or not the funding was going to come through?

A.   Either myself or Sofia did, yeah.

Q.   Did there come a point in time where you stopped following up?

A.   I'm sure it did.  I'm not still talking to him, so yeah, we would have stopped at some point.

Q.   Do you recall the last time you followed up with him?

A.   I do not.

Q.   Was it this year?

A.   This year?

Q.   Yeah.

A.   2020?  No.

Q.   Okay.  What about 2019?

A.   No.

Q.   What about 2016?



A.    That would make sense.

Q.    Okay.  So it is?

MR. BRODSKY:  Objection to the form.

BY MR. SHAW:

Q.    Is this the May 12th letter that we're looking at, marked as Exhibit 24, the letter that you're referring to in paragraph 24 of the complaint?

A.    If it's dated May 12th, then yes, it is.

Q.    Okay.  And did you review the May 12th letter when you received it?

A.    I'm sure I did.

Q.    Okay.  Do you recall reviewing -- strike that.

I'm going to show you what is tab 26 in the binder, which we'll mark as Exhibit 25.  I'll show you the caption here.

(Defendants' Exhibit 25 marked.)

A.    Okay.

Q.    Do you recall ever reviewing the Adana -- the complaint that I'm showing you as tab 26, which is Adana versus Forrest Capital Partners Inc., et al.?

A.    Again, I'm sure I skimmed through it.  I don't think I went through it line by line.

Q.    Okay.

A.    To me, the purpose of seeking out these documents was to show that it actually was happening and



so I could relay to my new boss.

Q.   Okay.  Did you see in the document that Adana was accusing the defendants of fraudulently inducing them to loan $15 million?

A.   I'm sure I did.

Q.   Okay.  And were you -- were you aware that Adana was alleging that the defendants made fraudulent statements and produced fraudulent bank records?

A.   Possibly.  I couldn't -- I couldn't say with accuracy.

Q.   Okay.  Did you ever raise the issue with Mr. Van Eman that Adana was alleging that Mr. Van Eman, among others, had produced fraudulent bank records?

A.   I can't recall.  To answer that question specifically, I don't recall.

Q.   Okay.  I'm going to show you what is tab 27 in the binder, which we'll mark as Exhibit 26.  Did you ever review the amended complaint that Adana filed against Forrest Capital?

(Defendants' Exhibit 26 marked.)

A.   Again, probably skimmed it.

Q.   And I'm going to show you on page 10 just the header here, "Defendant Forrest Capital, LLC, Transfers Adana's Funds to Forrest Capital, Inc., the JV Group, McConley, and Capital B."  Do you see that?



correct?

A.   Yeah.

Q.   Okay.  And I -- just for completeness of the record, I'll show you what was marked as Exhibit 15, which is an e-mail that you sent with that same response as below.  Actually -- so we'll stay on --

A.   Yes, please.

Q.   Okay.  So I want to go through.  "Jason, I find a lot of the below e-mail extremely concerning.  Nothing to report is completely incorrect.  You and your colleagues were in court yesterday in regards to a case that directly affects our production.  I think the right thing to do would have been you sending us an e-mail last night detailing in depth what took place."

Do you see that?

A.   I do.

Q.   "Instead I once again had to chase you and even have our own lawyers look in the public records to get a clue as to what was going on."

Do you see that?

A.   I do.

Q.   As of December 3rd, 2015, had you requested lawyers to look in the public records to get a clue as to what was going on?

MR. BRODSKY:  Tom, don't answer communications



you had with your counsel.

MR. SHAW:  I am simply asking whether or not he retained his own lawyers to look into the public records to get a clue as to what was going on, as he disclosed to non-parties in this case.

MR. BRODSKY:  No.  You asked him if he had asked his lawyers to do it, which is attorney-client communication, which you second --

BY MR. SHAW:

Q.   My question is:  Did you have your own lawyers look into the public records to get a clue as to what was going on?

A.   So to be clear, he wasn't my lawyer.  He was our new -- he was our New York lawyer that Sofia had retained, and he had looked into -- helped us look into public records, yeah.

Q.   Okay.  Did you review the records that --

A.   They're the ones that you've shown me earlier.

Q.   The records that you reviewed were the ones that we looked at?

A.   That's correct.

Q.   Okay.  Mr. Van Eman responded, "As I reported, the hearing went well."

Did you get any additional information about the hearing, or did you solely rely upon what



fee.  What my net profit would be, I don't know.

Q.  Have you tried to get an estimate of what your net profit would be?

A.  No, because the film was never financially successful.

Q.  Okay.  But didn't we spend a bunch of time talking about the calculations that you did to figure out your net profit earlier?

A.  That's correct.  Again, I misspoke.

Q.  You misspoke, so you never did that calculation?

A.  No, I did not.

Q.  Okay.  You claim that you have reputational damages?

A.  That's correct.

Q.  How will you prove reputational damages?

MR. BRODSKY:  Objection to the form.

A.  How will I prove it?

Q.  Yes.

A.  I assume by bringing witnesses of people who are also part of my industry, that knew that I was a part of this.

Q.  Has anybody refused to work with you as a result of your involvement with London Town?

A.  No.



Q.   Okay.  Have you been able to remain involved in the entertainment industry since your involvement with London Town?

A.   Yes.

Q.   Are you involved with the production of films since your involvement with London Town?

A.   Yes.

Q.   Have you been able to earn compensation since your involvement with London Town?

A.   Yes.

Q.   Okay.  So how has your reputation been damaged as a result of Defendants' torts?

A.   The first thing being that I had just received -- I had just taken a new job, as we've talked about.  I had a meeting with my new boss and the WeatherVane team.  I had literally just joined the company, and this was something that I believe was fundamental as one of the reasons as to why I had been hired, and obviously it then subsequently imploded and I think dramatically affected my boss's feelings of my capability.

Q.   And what company was that?

A.   That was at Content Media.

Q.   Content Media.  And is Content Media still in business?



A.    It's not.

Q.    Okay.  And when did it go out of business?

A.    I believe it went into receivership beginning of this year.

Q.    Okay.  And when did you leave Content Media?

A.    In 2017.

Q.    Okay.  Were there other additional reputational damages that you're claiming were caused by Defendants' tortious conduct -- alleged tortious conduct?

A.    No.

Q.    Okay.  Who was the boss that -- was it Jamie?  What's his last name?

A.    Carmichael.

Q.    Where is he located?

A.    I believe he's here in Los Angeles.

Q.    Do you still speak with Mr. Carmichael?

A.    I do not.

Q.    Okay.  Why did you leave that company?

A.    I left Content because it was acquired by a Canadian company called Q Media, and they no longer wanted a film division.

MR. SHAW:  Okay.  Why don't we take a short, five-minute break, and I think I'm nearly done.  I just want to look through my notes.



Q.   Okay.  Reading this, do you understand that principal -- the unpaid principal for the Vandermolen bridge loan is a component of the damages that London Town Pic is trying to recover here?

A.   Yes.

Q.   Do you understand that the unpaid principal is part of the damages?

A.   The unpaid principal of the bridge loan, yes, because it was never repaid.

Q.   Okay.  But do you understand that we're trying to claim that as damages here?

A.   Yes.

Q.   Okay.  Where do you see that in the interrogatory response?

A.   The primary advance -- sorry.  Unless I'm misreading this --

Q.   I'm asking you:  Where do you see that in the first paragraph?

A.   In the first paragraph, I don't see that in the first paragraph.

Q.   Okay.  So are you sure that we're trying to recover the principal?

A.   No.

Q.   Okay.  And if you -- let's figure out how this number, $7,197,220.06, was calculated.



LONDON TOWN PIC LIMITED 30B6                          September 23, 2020
LONDON TOWN PIC vs WELLS FARGO BANK                                 201

CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF DUVAL  )

     I, MATTHEW McKINNEY, Florida Professional Reporter, Notary Public, State of Florida, certify that THOMAS BUTTERFIELD personally appeared before me via videoconference on September 23, 2020, and was duly sworn.

     Signed this 2nd day of October, 2020.

_____
                Matthew McKinney, FPR
             Notary Public, State of Florida
             Commission No.:  GG 099111
             Expires: June 9, 2021

MATTHEW MCKINNEY
MY COMMISSION # GG 099111
EXPIRES: June 9, 2021
Bonded Thru Notary Public Underwriters

                              Personally Known_____

                    Or Produced Identification___X___

             Type of Identification Produced___DL___



800.211.DEPO (3376)
EsquireSolutions.com

CERTIFICATE OF REPORTER

STATE OF FLORIDA )

COUNTY OF DUVAL   )

        I, MATTHEW McKINNEY, Florida Professional Reporter, do hereby certify that I was authorized to and did stenographically report the videotaped deposition of THOMAS BUTTERFIELD, that a review of the transcript was requested, and that the foregoing transcript is a true and complete record of my stenographic notes.

        I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

        DATED this 2nd day of October, 2020.



_____
        Matthew McKinney, FPR

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com