# EXHIBIT 4

FINANCIER TERM SHEET

| | |
|---|---|
| Parties: | London Town Pic. Ltd. |
| | Suite 412, Gilmoora House |
| | 57-61 Mortimer Street |
| | London, W1W 8HS<br>Attention: Sofia Sondervan-Bild<br>(hereinafter referred to as the "Company" or the "Producer") |
| | and |
| | WeatherVane Productions, Inc.<br>PO Box 3524<br>Bartlesville, OK<br>74006<br>(hereinafter referred to as the "Financier") |

Purpose/Picture:    Financier desires to provide a portion of the financing for a feature length motion picture to be produced by Company; to be based upon that certain screenplay (the "Screenplay") by Kirsten Sheridan and Sonya Supple, with revisions by Matt Brown, currently entitled *London Town* (the "Picture"). The Picture will be an English language, live action feature of 90 to 120 minutes in length. Sofia Sondervan, Christine Vachon and Tom Butterfield shall be three of the individual producers of the Picture. Derrick Borte will be the director of the Picture. Jonathan Rhys Myers shall star in the principal role of "Nick" and both Daniel Huttlestone and Dougray Scott shall be cast in principal roles (together, the "Principal Cast"). The Picture (including the entire budget thereof, which shall include the post production budget) will be bonded by European Film Bond (EFB) with Financier being a beneficiary of such bond. The production of the Picture shall be insured by Wells Fargo with general liability (including errors and omissions) insurance with a deductible of no more than $10,000 and a claim aggregate of no less than $3,000,000 (and one million per single claim) (the "Insurance Packet", which shall include the endorsement of Financier as an Additional Insured Party). Prior to public exhibition, Company shall also obtain adequate and customary errors and omissions insurance coverage which policy or policies shall also name Financier as an additional insured party.

Date:    June 10, 2015

For good and valuable consideration as set forth below, the parties agree as follows:

1.    Investment. Subject to the terms and conditions contained herein (the "Agreement"), Financier agrees to make an investment in the Company for purposes of assisting in the financing of the Picture in the amount of Two Million One Hundred and Six Dollars (US$2,106,000) minus the Vandermolen Bridge Loan and associated interest, legal and arrangement fees (the "Investment"). Company shall use the Investment for the sole purpose of paying expenses required for the production of the Picture, that is, items that shall be set forth in the budget of the Picture (the "Budget"), which shall be Three Million Dollars (US$3,000,000)

EXHIBIT

7

LT-005733

plus or minus Seven Hundred Fifty Thousand Dollars (US$750,000).  Investor shall receive a non-budgeted fee of 5% over the amount of their final equity investment into the film upon payout of that investment.

2.      Allocation of Receipts.

2.1      For the purposes hereof, "Adjusted Gross Proceeds" shall be defined as 100% of all monies actually received by or credited to the Company and/or any affiliate, designee, subsidiary, owner, assignee or successor thereof, from the exploitation of the Picture and any rights therein (e.g., not to include any amounts retained by any distributor, sales agent, exhibitor, collection account administrator, producer rep or the like and therefore not actually received by the Producer), including without limitation pre-sales, tax rebates or incentives ("Gross"), minus taxes (but not income taxes) the Company is required by applicable law to pay off the top of such Gross in Perpetuity,

but not to include:

a.      Up to $600,000 of tax credit / incentive income ["Tax Revenues"] paid to any lender ("Lenders") who made a loan against Tax Revenues;

b.      Gross used to pay required collective bargaining organization obligations to the extent not paid by the applicable distributor or exhibitor and to the extent resulting from that distributor or exhibitor's exploitation;

and, net of (minus) only amounts actually paid off-the-top therefrom for the following:

(i)       required taxes (but not any income taxes) due relating to the Picture's revenues other than the revenues described in (a) through (b) above,

(ii)      all union/guild (including SAG, DGA, WGA, or other collective bargaining organization) residuals and supplemental market payments due from and applicable to revenues other than the revenues described in (a) through (b) above,

(iii)     other customary, reasonable, direct and out-of-pocket expenses paid by Producer relating to the Picture (e.g. maintenance of the single purpose entity or the Copyright in the Picture, third party reasonable and customary legal and accounting costs, insurance maintenance, etc.) however, at such time that such expenses, in the aggregate, have amounted to $10,000, thereafter such expenses shall not exceed $3,000 in any calendar year,

(iv)     Producer's actual, out-of-pocket, third party, direct, distribution and marketing expense payments made in respect of the Picture, if any, including, without limitation, creation and delivery of deliverables (including the creation of foreign language versions), payments to sales agents, reasonable festival expenses, marketing expenses and P&A expenses (all of the above if and only to the extent actually incurred by Producer), not to exceed $75,000 in the aggregate,

(v)      reasonable third party direct out-of-pocket collection expenses pursuant to Section 2.4 hereof,

(vi)     ongoing third party direct reasonable insurance payments related to the Picture not already part of the Budget and to the extent incurred by Producer,

(vii)    third party, out of pocket costs of defending or making claims and other litigation expenses, other than expenses required to be indemnified by third parties, and

2

LT-005734

(viii)    reasonable reserves relating to the above (not to exceed 15% of Gross and held for a maximum of twelve (12) months).

2.2    Adjusted Gross Proceeds shall be distributed as follows, in the following order of priority:

a.    First, 100% of Adjusted Gross Proceeds shall be paid to a first priority recoupment party ("First Priority Recoupment Party") until First Priority Recoupment Party has recouped $500,000 + 15% of its investment.

b.    Next, 100% of remaining Adjusted Gross Proceeds shall be paid to a Mezzanine Financier for an amount up to $565,000 until Financier has recouped 115% of the $565,000 Investment.

c.    Next, 100% of remaining Adjusted Gross Proceeds shall be paid to Financier for the investment of $2,106,000 plus 15% and to another equity investor for the amount of $122,000 + 15% until such time as they have recouped their contributions (plus 15%).

d.    Next, 100% of remaining Adjusted Gross Proceeds shall be paid to a Financier for the investment of $115,000 + 30% until such time as they have recouped their contributions.

e.    Next, 100% of remaining Adjusted Gross Proceeds shall be paid to those rendering services or granting rights in connection with the Picture with whom Company has agreed to pay deferred compensation ("Deferrals").   The entirety of the amounts allocated pursuant to this subsection e (and all Deferrals in the aggregate) shall not exceed $600,000.

f.    Next, following the payment of Deferrals, 100% of remaining Adjusted Gross Proceeds shall be referred to as "Net Profits".   As consideration for the Investment, Financier shall be entitled to that pro-rata portion of 50% of 100% of the Net Profits (the "Financiers' Net Profits") equal to that percentage of aggregate equity investments consisting of the Investment.   No investor shall receive more advantageous or beneficial terms nor shall the Financier receive less than its pro-rata share of the Financiers' Net Profits in accordance with the above.

g.    No withholding of VAT shall lessen or dilute amounts due to Financier hereunder.

2.3    Financier shall be paid Adjusted Gross Proceeds and Financier's Net Profits, if any are due, calendar year quarterly during the first three (3) years following the initial release of the Picture and bi-annually thereafter, accompanied by proper statements.  Any statement regarding Net Profits not disputed in writing within thirty-six (36) months of receipt shall be deemed accepted.  With regard to any disputed statement, Financier shall have the right to designate a certified public accountant to audit the books and records of the Company at Company's regular place of business and at Financier's expense during regular business hours and on at least two weeks prior written notice, but not more than once in any calendar year.  If there is an aggregate underpayment of 7.5% or more found with respect to the statements audited in the aggregate, then Company shall promptly pay the expenses of the audit (in addition to the unpaid amounts).

2.4    Freeway shall be the collection agent and shall be engaged with respect to the allocation and distribution of the above entitlements as well as all other Gross due to all parties entitled to any part thereof, pursuant to customary and standard terms.  The CAMA with Freeway shall in all respect be consistent with the terms hereunder, and shall specifically reference the Financier and its entitlements.  The Financier shall be a named beneficiary to the CAMA agreement.  Such agreement shall be sent to the Financier for review and comment prior to execution in order that the Financier may obtain evidence of the foregoing and ensure that the Company is not in breach or default.

3.    Decisions.  A copy of the Budget, production schedule, and cast & key crew lists, and any amendments thereto, will be delivered to Financier upon request.  The Company shall have the exclusive

3

LT-005735

right to make decisions regarding the Picture, subject to the terms hereof, and shall have final authority on all material matters attendant to the Picture and its exploitation, other than as specifically set forth herein. Subject to availabilities, schedules and contractual restrictions, the Financier shall be welcome to visit set, to consult with Company's principal regarding progress, and shall be invited to test and other screenings, festivals and premieres.  The Financier shall be consulted and shall be kept informed of distribution deals attendant to the Picture.

4.	Credit:  Financier shall have the right to designate parties to receive three "Executive Producer" credits on screen, in the front end main title credits of the Picture (unless all producer credits are back end), no smaller or less prominent than any other executive producer on a shared card.  WeatherVane Productions, Inc. shall receive company credit and opening animated logo of the same billing of all other production companies, in the front end main title credits of the Picture (unless all company credits are back end), no smaller or less prominent than any other company credits.  Such Executive Producer and company credits shall also appear in the billing block of all paid ads (if and when any other executive producer and company credit appears thereon) and elsewhere such billing block containing any executive producer  and company credits appears.  No casual or inadvertent failure by Company, or any failure by a third party, to accord such credits shall be deemed a breach by Company.  Company shall employ all practical efforts to remedy any such failure prospectively following written notification thereof from Financier.  Company shall inform (and, as with regards to domestic distributors and/or exhibitors, bind) in writing all third party licensees of rights in or to the Picture of the above credit obligations.  Except as set forth above, all aspects of credit shall be at the Company's sole discretion.  Financier shall have a company logo at the front of the film together with all the other logo's.

5.	Copyright.  Company shall own, forever and throughout the universe, all rights of any kind or nature in and to the Picture and the results and proceeds of Financier's services and contributions hereunder, in any and all media now known or hereafter devised including, as a "work made for hire" for Company under United States Copyright laws.  To the extent that any results and proceeds of Financier's services hereunder may not be deemed a "work made for hire" under United States Copyright laws, Financier hereby assigns to Company all right, title and interest therein.  Financier agrees to give Company, its designees, successors, licensees and/or assigns all assistance reasonably required to perfect such rights, titles and interest in the name of the Company.  Financier hereby waives any and all right, title and interest of any kind or nature, whether now or hereafter known, Financier may have in and to such results and proceeds, including without limitation any rights of droit moral, rental or lending or similar rights. The termination of this Agreement for any reason shall not affect the ownership by Company of the results and proceeds of Financier's services hereunder.

6.	Risk of Investment.  Investments in the motion picture industry involve a high degree of risk. There is no guarantee that the Picture will generate revenues or that any such revenues will be sufficient to return to Financier all or any part of the Investment.  The Financier acknowledges that the Investment should not be made if the Financier is not prepared to lose the entirety of the Investment or if the Financier requires liquidity or a market in which to sell its interests hereunder.  Financier acknowledges that no offering literature has been filed with, or in any way examined by, any government authorities, including, without limitation, the Securities and Exchange Commission ("SEC"), and Financier hereby expressly waives Financier's right to receive information in an offering circular that would otherwise be required by certain provisions of the law.  Financier warrants that it is a sophisticated, "accredited" investor (as defined by the SEC) with meaningful ties to Company who has reviewed this Agreement with the aid of professional legal counsel, and that he shall release Company, its employees, managers, members, owners, principals, representatives, successors, and affiliates from any liability resulting from any breach of any term or provision of any "blue sky" law or the Securities Act of 1933, or any similar state law, rule or regulation.

7.	Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the parties' respective licensees, successors and permitted assigns.  Neither party shall have the right to assign this

LT-005736

Agreement (although the Financier shall have the right to assign its rights to receive revenue hereunder) although nothing in the foregoing shall result in any restriction on the Company's ability and right to sell, assign, license or otherwise dispose of rights in and to the Picture to third parties.

8.      Warranty/Indemnity.  Financier warrants that it has the right to enter into this Agreement and that the performance hereof shall not violate the terms of any other agreement.  Company warrants that the Budget shall be sufficient to complete the answer print of the Picture and deliver to distributors.  In no way meant to limit the foregoing, the Company further warrants:

(a)      Producer owns all right, title and interest in and to the underlying rights for the Picture and has the full right, power and authority to enter into this Agreement, to grant the rights granted herein, and to perform and fulfill all of the obligations to be rendered and satisfied by it hereunder, and that there are no claims, facts or circumstances existing or pending which would prevent its full performance of its obligations hereunder;

(b)      Producer is a corporation duly formed, validly existing and in good standing under the laws of its place of organization;

(c)      none of the statements, representations or warranties made by Producer in this Agreement contains any untrue statement of a material fact or, to the best of Producer's knowledge after reasonable inquiry, omits any material fact;

(d)      Producer shall procure and maintain the Insurance Packet (the costs of which shall be included in the Budget, other than later maintenance costs as set forth in 2.1);

(e)      Producer shall pay and discharge all taxes (e.g. payroll taxes) and other amounts and obligations imposed by any governmental entity in connection with the production or distribution of the Picture on a timely basis;

(f)      all materials used in the Picture are or will be original with Producer, in the public domain or licensed to Producer for use in the Picture by the parties which own or control such rights, and no part of the Picture nor the exhibition, distribution, exploitation, promotion or other use of the Picture as contemplated herein violate or infringe upon any copyrights or any rights of publicity or rights against libel, slander, defamation, invasion of privacy or unauthorized use of name, likeness or biography;

(g)      this Agreement has been duly executed by Producer and constitutes a valid and enforceable obligation of it;

(h)      Producer will make all payments to third parties with regard to any third party profit participations consistent with the terms herein;

(i)      Producer has not made or assumed, and will not hereafter make or assume, any commitment, agreement or obligation that will or might be reasonably expected to conflict with or impair Financier's complete enjoyment of the rights and privileges granted to it hereunder;

(j)      Producer has not granted, assigned, encumbered, or otherwise disposed of any right, title or interest in or to the Picture or any rights similar, adverse to or inconsistent with the rights granted hereunder, or by which any of the rights granted hereunder or the full exercise of any or all such rights might be reasonably expected to be diminished, encumbered or impaired and will not do so in the future;

(k)      Producer owns and controls, and has not licensed or assigned, any of the distribution or exploitation rights in and to the Picture as of the date hereof.

Company shall indemnify and hold harmless Financier from and against any and all actually suffered losses, obligations, fees, costs, expenses, liabilities, penalties or damages resulting from third party claims,

LT-005737

complaints or settlements arising from or in connection with Company's material breach hereof, any failure of warranties listed above or the development, production, distribution, or exploitation of the Picture.

9.      Notices.  Notices hereunder shall be in writing, and set to the parties at their respective addresses set forth above.  Notices may be delivered by personal delivery, confirmed email or facsimile, mailing via certified or registered mail or Federal Express. Courtesy copies of notices to Company shall be sent to Ben Feldman, Esq.,  Feldman, Golinski, Reedy + Senouf PLLC, 100 Wall Street, 23rd Floor, New York, NY 10005, Email: bfeldman@fgrslaw.com, Fax: 212-230-1090.

10.      Other Benefits. Once commercially available, the Financier shall receive on a complimentary basis six copies of the Picture (if Blu-ray available, it will be 3 DVD, 3 Blu-ray).  The Financier (defined as 3 principals) shall be invited to attend all major festival screenings and celebrity premieres (with a guest for each) on a complimentary basis (there will be no obligation to provide travel or lodging expenses unless other executive producers receive travel and lodging expenses) and shall receive three pairs of tickets to any U.S. premiere.  Financier shall receive two Airline Tickets and 5 days of accommodations Most Favored Nations with the Producers and Director of the film.

11.      Miscellaneous.  It is expressly understood, agreed and covenanted that the parties do not by this Agreement intend to form an employment relationship, partnership or joint venture between them (the parties shall be independent contractors), and in no event shall this Agreement be construed as such.  This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any third party, whether referred to herein or not.  This Agreement shall be governed by the laws of the State of New York applicable to agreements entered into and wholly performed therein without regard to its choice of law provisions. Financier agrees that under no circumstances including, without limitation, any breach or default or any alleged breach or default by Company shall Financier have the right to obtain equitable or injunctive relief or to rescind, terminate or enjoin the development, production, distribution or other exploitation of the Picture, it being agreed that money damages at law shall be a suitable remedy. This Agreement sets forth the entire understanding of the parties regarding its subject matter and may not be amended except by a fully executed written instrument signed by both parties hereto.  This Agreement may be executed in counterparts, or by facsimile or PDF, which shall not affect its validity.

 ACCEPTED AND AGREED TO BY:

_____          _____
WeatherVane Productions, Inc.                    London Town, Ltd.
By: Jason Van Eman,                                    By: Sofia Sondervan-Bild,
President                                                        Authorized Signatory
Date:  06-18-15                                            Date:  06-18-15

LT-005738