# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 20-21536-Civ-COOKE/GOODMAN

LONDON TOWN PIC LIMITED,
et al.,

Plaintiff,

vs.

WELLS FARGO BANK, N.A.,
WELLS FARGO ADVISORS, LLC,

Defendants.

------------------------------/

VIDEOTAPED VIDEO-TELECONFERENCE DEPOSITION OF

SOFIA SONDERVAN-BILD, as Corporate Representative

SEPTEMBER 16, 2020

9:35 a.m. - 3:39 p.m.

Reported by:   Deborah Lugo, CLR
Esquire Deposition Solutions - Tampa Office
Phone - (813) 221-2535, (800) 838-2814
Esquire Job No.:  J5972593



A.    I remember that from the agreements, yes.

Q.    Okay.  And then an individual named Jason Van Eman?

A.    Yes.

Q.    Okay.  And is it fair if I refer sort of collectively to those WeatherVane entities as WeatherVane?  Do you understand that?

A.    Yes.

Q.    Okay.  And when I refer to WeatherVane, I'm generally referring to Mr. Van Eman and his companies.  Okay?

A.    Okay.

Q.    All right.  When did you first learn of the company or that collective grouping WeatherVane?

A.    In the summer of 2014.

Q.    And was that through Mr. Butterfield?

A.    Yes, it was.

Q.    Prior to London Town, you had never worked with WeatherVane on any projects, correct?

A.    Not knowingly.

Q.    Okay.  Unknowingly?

A.    Not knowingly.

Q.    Okay.  Did you later learn there was a project you had worked on that WeatherVane was also on?



A.    That is correct.

Q.    Okay.  What project was that?

A.    That was called Urge.

Q.    Urge?  And when would -- when did you begin to work on Urge?

A.    I don't remember exactly.  It was either the end of 2013 or the beginning of 2014, but I was never ever told who the financiers behind Urge were.

Q.    Okay.  What was your role on Urge?

A.    I -- my company, a different company, owned a -- had a deal with the unions for a national agreement, which gives you the opportunity to negotiate rates as you see fit for your production.  It's a very lucrative deal.

I signed onto Urge so that as a co-producer so that they could use my deal to get better rates for their crew.

Q.    Okay.  Other than what you just described, did you have any involvement in the production of Urge?

A.    I did not.

Q.    Okay.  So you had no involvement in the financing of the film?

A.    Not at all.



A.    The day that Petra Hoebel and myself were served by the IOTSI that we had not paid the employees of Urge and that we owed $435,000 to the IAA.

Q.    And when was that?

A.    Christmas 2013, I believe.

Q.    And what did Ms. Apel tell you?

A.    She said that she believed that they would be able to pay -- that they would be able to pay the employees within a few weeks, that the financing was coming and that to her understanding it would all get resolved.

Q.    Did it get resolved?

A.    She also -- I'm sorry.  She also did not know anything about the financing.  Eventually it got resolved.

Q.    When did you learn that WeatherVane had been involved in the financing?

A.    I believe in the summer or fall of 2015.

Q.    And how did you learn that WeatherVane had been involved in the financing?

A.    I'm not sure.  I don't remember.

Q.    Did you discuss with Mr. Butterfield that WeatherVane had been involved in the financing of Urge?



A.   I did.

Q.   And what did you discuss?

A.   I asked Mr. Butterfield to ask Jason Van Eman if Urge was getting paid so that I would know that I would -- that the union would be paid off.

Q.   And, to your knowledge, did Mr. Butterfield make that ask of Mr. Van Eman?

A.   He did.  And Mr. Van Eman told him that the money was -- had started to come in.

Q.   Was that, in fact, true?

A.   I don't know.  All I know is that it did get resolved eventually.

Q.   Were you personally liable for any of those outstanding monies?

A.   I was.

Q.   And, to your knowledge, or did you have to pay any money personally to resolve that outstanding debt?

A.   I had to pay legal fees, which were reimbursed to me through the settlement.

Q.   Through that settlement?

A.   The settlement with Urge Productions.

Q.   Settlement among who?

A.   Euro Pictures, Inc. and the loan provider to Urge and Urge Productions, I believe.



Q.   Was it Adana?

A.   It was not.

Q.   Was the individual's first name Sergi {phonetic}?

A.   No, he was from Australia.  And I don't remember his name.  I think it was something like Warren.  I honestly don't remember his name, but he was from Australia.

     I have never spoken to him again, dealt with him on any other productions or heard his name ever again, which is why I don't remember.

Q.   Other than the legal fees that you had to pay, did you come out-of-pocket any money there?

A.   Once I was reimbursed or prior to being reimbursed?

Q.   Well, you said you were reimbursed for legal fees, right?

A.   Correct.

Q.   But I want to look outside of legal fees. Were you out-of-pocket any money?

A.   I was because I actually was reimbursed a certain amount and then decided to give the legal people involved some more money because it was a very complicated case.

Q.   How much were you out-of-pocket?



A.    Perhaps $2,500.  But there was a much -- I'm sorry.  There's a much bigger problem, which is that because of Urge I lost my union deal forever and ever; and that number is in the perhaps millions.

Q.    And when did you lose that union deal?

A.    As soon as the union came after us for the outstanding money.

Q.    And was that in 2013?

A.    20 -- yes, 2013.

Q.    So as soon as they came after you for the outstanding money, you lost that union deal; correct?

A.    That's correct.

Q.    Okay.  And then in your view the loss of that union deal equates to the loss of millions of dollars?

A.    It does.

Q.    You used the phrase "the case," when you were talking about your legal fees.  And I want to just understand what you mean when you use the phrase "the case."

A.    The case between Euro Pictures, Inc.  It wasn't a legal case.  It was a settlement I guess you would call it between Euro Pictures, Inc. and



Urge Productions where we settled that they would pay off the amounts owed and we would be reimbursed our legal fees.

Q.   Okay.  I appreciate that distinction.  When Ben and I hear the word "case" we think legal action.

A.   Yeah, that was no --

Q.   You have a different language or phrase that you might use when understanding a case, that's why I wanted to make sure I understand it.

A.   Yeah.  I'm sorry about that.

Q.   Don't be sorry.  I'm just making sure we speak the same vernacular.

Have you ever spoken with Mr. Van Eman?

A.   I have.

Q.   Okay.  When is the first time you recall speaking with Mr. Van Eman?

A.   I believe it was at the beginning sometime in 2015 where we had a call in which he basically conveyed his enthusiasm of being involved with the film and kind of walked us through how the scheme would work.

Q.   Have you ever taken any action -- circling back to the union deal.

Have you ever taken any action or recovered



SOFIA SONDERVAN-BILD                                          September 16, 2020
LONDON TOWN PIC LIMITED vs WELLS FARGO                                        91

A.    I think it went up a bit from there, but we tend to use round numbers when we raise financing. If it's an LOI or something like that you don't go into the digits, you know, the fine digits there.

Q.    Okay.  And what was your understanding of the deal as it's articulated in the attached document or, excuse me, the document I'm showing you, the letter of interest?

A.    That they would give us one and a half million dollars in equity in exchange for some credits and some, you know, small vague of 15 percent and an equity stake in the film.  So basically they would be providing 50 percent of the budget.

Q.    And what was your understanding of when the financing discussed in this letter of interest was to close?

A.    Well, that moves a bit, you see, because WeatherVane said that they would be closed within 60 days and then that became 90 days.  So eventually the bridge loan closed, everything else closed, but the WeatherVane money as you know never arrived.

So we had actors scheduled that we had to satisfy or, otherwise, we wouldn't be able to



A.    I don't believe so.

Q.    Had you learned that WeatherVane was going to bring in financing from Adana as of June of 2015?

A.    No.  I thought everything was going through Alastair Burlingham.

Q.    Okay.

A.    Like I said, Tom really was dealing with the financial specifics of this.

Q.    WeatherVane never complied with its obligations regarding this agreement, correct?

A.    That's correct.

Q.    When was WeatherVane supposed to provide the funding that's required under the terms of this agreement?

A.    Within 30 to 45 days of the match being made.  So from what I remember -- and I hope I'm correct -- the match money would go in, there would be five days for the match to be completed, and then 30 to 45 days from that time we would receive our funding, which is why we have such a high amount of interest on our loan because we never thought that we would not receive that funding.

Q.    Okay.  And, to the best of your recollection, when was that 30 to 45 day time frame



supposed to conclude so that the funding would be in place?

A.   I believe it was at the start of postproduction of the film, just before the start of postproduction, so sometime in August or very early September of 2015.

Q.   Okay.  And --

A.   I think the earliest -- sorry to interrupt you.  I think the earliest was the beginning of August and I think the outside date was the beginning of September, something like that.

Q.   And, again, Mr. Van Eman failed to come through on that financing in that time frame, correct?

A.   Oh, absolutely.  Yep.

Q.   And to date he has failed to come through on that financing?

A.   Yes.

Q.   Why did you wait from 2015 --

MR. SHAW:  Strike that.

BY MR. SHAW:

Q.   Have you ever filed an action against Mr. Van Eman for breach of the contract?

A.   No.

Q.   Have you ever pursued WeatherVane for



breaching the contract?

A. No.

Q. Why?

A. Because --

MR. BRODSKY: I'm going to -- don't -- if this requires you to disclose communications with your attorney, I'm going to advise you not to do so. If you can testify otherwise, go ahead.

A. I wasn't -- I don't -- we just didn't.

BY MR. SHAW:

Q. Did you ever discuss doing so with Mr. Butterfield?

A. No. I don't know. I don't know is the answer.

Q. You'd agree that in that August, September, October 2015 time frame, Mr. Van Eman failed to comply with his promises to you, correct?

A. Correct.

Q. Okay. And did he continue to make representations to you that the money was forthcoming?

A. Yes, he did.

Q. And that money never came, correct?

A. Correct.

Q. And would he continue to make promises and



those promises continued to be broken?

A.   Correct.

Q.   Okay.

A.   And I'm sure you've seen e-mails from 2016 where I'm still asking him, Is the money coming in? And he says, Yes.

Q.   Right.  And every time he said the money was coming, it never came, correct?

A.   Correct.

Q.   Did there come a point of time where you stopped believing what he was telling you?

A.   I think in 2017 when Vandermolen sued Wells Fargo is when we realized this money is probably never going to come because then all of a sudden there was a huge bank involved and it was a completely different story.

Q.   Is it sitting here today your belief that Vandermolen sued Wells Fargo in 2017?

A.   I believe that's what I heard, yes.

Q.   I'm going to show you tab 32.

Have you ever seen this document before?

A.   I want to make one correction.  It's possible that Vandermolen sued Wells Fargo at the end of 2016.  I personally haven't -- didn't hear of it until 2017.



A.   Those are the two letters I was referring to that we saw copies of.

Q.   Okay.  Did you see a June 2, 2015 e-mail sent from someone named Benjamin Rafael to Adana?

A.   I was forwarded two -- I don't -- does the e-mail have a letter attached?  I only saw letters personally.

Q.   So you don't recall seeing a letter from Wells -- an e-mail from somebody at Wells Fargo?

A.   I had only -- none of these were to me personally, first of all, or nor was I a party to their, you know, to who they were sent to, but I received copies of these letters from both Tom Butterfield and then later one from Alastair Burlingham saying the matches happen, here's the confirmation from Wells Fargo, everything is on track for our match to happen.

Q.   Okay.  You mentioned Aaron Kaufman earlier. Who is Mr. Kaufmann?

A.   I believe he's one of the producers of Urge.

Q.   Forgive me if I asked this already.  Was it Mr. Kaufman the one who disclosed that WeatherVane was involved in Urge?

A.   I don't remember.  It may have been

Q.   Now, in the middle here you're going back and forth as you reviewed with Mr. Kaufman.  And it says -- you were e-mailing Mr. Kaufman -- did you hear WeatherVane is getting sued?  Do you see that?

A.   Uh-uh.

Q.   And this is as of November 11, 2015, correct?

A.   Correct.

Q.   What was your knowledge of a suit against WeatherVane as of November 11, 2015?

A.   I had heard that Adana was going to sue WeatherVane.

Q.   And what did you hear?

A.   Just that Adana had invested in a lot of movies aside from ours and that they were going to try to sue WeatherVane to try to get their money back.

Q.   What was your understanding of why Adana needed to sue to get its money back?

A.   Well, as you can see from my e-mails I think it's pretty clear that I had no idea what was happening, that's why I was asking if he knew anything.

Q.   I'm just reading what's in your e-mail.  I want to understand what you knew beyond what you



just told me about Adana suing to get its money back.

How did you hear that?

A.    I believe Tom forwarded me an article that he had read or pulled up that talked about Adana suing WeatherVane.

Q.    Did you talk with Tom about the fact that Adana had to sue WeatherVane?

A.    We talked about it and we were trying to figure out what that meant.

Q.    Was it concerning to you that Adana was required to sue WeatherVane to get its money back?

A.    Obviously, yes.

Q.    And it was at the same time too that WeatherVane has already breached its financing agreement with you, correct?

A.    That's correct.

Q.    Okay.  And funding was supposed to have come through by WeatherVane that had not come through as of November 11, 2015, correct?

A.    That's correct.

Q.    Okay.  Did you believe as of November 11, 2015 that maybe some of the statements that WeatherVane had said to you were turning out not to be true?



A.   Correct.

Q.   Okay.  And you go on to say -- this is the e-mail here from you to Mr. Kaufman -- I'll introduce -- I'll intro you in the a.m.  No problem.  They are in the UK.

And I believe if you look at that e-mail you're referring to introducing them to Head Gear, correct?

A.   That's correct.

Q.   And then you're responding, no, this is a different company suing.

So somebody different than Prescience, correct?

A.   Correct.

Q.   Suing WeatherVane, correct?

A.   Correct.

Q.   And we talked about that was Adana that was the entity that you were aware of that was suing WeatherVane, correct?

A.   Correct.

Q.   And then you say, I think they are a scam.

Are you referring to WeatherVane?

A.   I think so, yes.

Q.   Okay.  So is it fair to say that as of November 11, 2015, you believed that WeatherVane



THE VIDEOGRAPHER:  Okay.  We're going off the record the time is now 3:13.

(Brief recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:15.

A.   So it's a company out of the UK called The Exchange.

BY MR. SHAW:

Q.   Have they asked you about London Town?

A.   No.  I'm not the direct contact to them.

Q.   Who is?

A.   It's a company in the UK called Epic.

Q.   Okay.  Has anyone told you they would not provide an investment to you as a result of your experience with London Town?

A.   Not directly.

Q.   Indirectly?

A.   I mean, people have asked, you know, didn't she have business with WeatherVane?  And, you know, weren't they a bad company?  I've heard that from kind of through the grapevine, but nobody's talked to me directly about it.

Q.   Who did you hear it from through the grapevine?

A.   I don't remember.



SOFIA SONDERVAN-BILD
LONDON TOWN PIC LIMITED vs WELLS FARGO

September 16, 2020

221

Q.   So sitting here today you cannot tell me from whom you've heard that?

A.   No.

Q.   And sitting here today you cannot give me the identity of any individual who indicated they wouldn't work with you because your experience on London Town?

A.   No one had said that to my face, no.

Q.   Okay.

A.   Can I add one thing?

Q.   Uh-uh.

A.   I have been approached over the years by people to use my union contract which also I no longer am able to use.

Q.   That's as a result of the Urge issue that we talked about earlier, correct?

A.   Correct.

Q.   Right.  And that's not listed as a damage that you're seeking in this litigation, correct?

A.   Yes.  Okay.  I just wanted to let you know that.

Q.   Okay.  Out-of-pocket expenditures for film festival travel, $20,000.  Which film festivals?

A.   The LA Film Festival, the Cannes Market, the London Film Festival, and the Rome Film



CERTIFICATE OF OATH

STATE OF FLORIDA                    :

                                   :

COUNTY OF PASCO                     :


        I, the undersigned authority, certify that the

deponent named herein, SOFIA SONDERVAN-BILD, personally

appeared before me and was duly sworn.


        WITNESS my hand and official seal this

September 29, 2020.


DEBORAH LUGO
MY COMMISSION # GG 001759
EXPIRES: October 11, 2020
Bonded Thru Budget Notary Services

DEBORAH LUGO, CLR
Notary Public
State of Florida
My Commission Expires 10/11/2020
Commission No. GG 1759



CERTIFICATE OF COURT REPORTER


STATE OF FLORIDA


COUNTY OF PASCO


        I, Deborah Lugo, Court Reporter, certify that I was authorized to and did stenographically report the deposition of SOFIA SONDERVAN-BILD; that a review of the transcript was requested; and that the transcript, is a true and correct record of my stenographic notes.

        I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

        DATED this September 29, 2020.

_____
DEBORAH LUGO, CLR

