# EXHIBIT 7

Harbottle & Lewis

Dated                    2015

# Bridge Loan Agreement

relating to the proposed film "London Town"

(1)    Vandermolen Film Co. Ltd

(2)    London Town Pic Limited

Harbottle & Lewis LLP          T + 44 (0)20 7667 5000
Hanover House                  F + 44 (0)20 7667 5100
14 Hanover Square              www.harbottle.com
London                         DX 44617 Mayfair
W1S 1HP

Ref: 350

8437353-1

EXHIBIT

**8**

LT-000821

## Table of Contents

1.  Availability and Drawdown...................................................................................................1
2.  Currency of Facility ..........................................................................................................1
3.  Conditions Precedent .......................................................................................................2
4.  Interest, Premium and Arrangement Fee ........................................................................4
5.  Repayment .......................................................................................................................4
6.  Representations, Warranties and Undertakings ..............................................................4
7.  Undertakings ....................................................................................................................7
8.  Events of Default ..............................................................................................................9
9.  Credit and Premiere .........................................................................................................9
10. Notices............................................................................................................................10
11. Further Assurance ..........................................................................................................10
12. No Partnership................................................................................................................10
13. Confidentiality ................................................................................................................10
14. Assignment and Sub-Participation .................................................................................11
15. Expenses and Taxes ......................................................................................................11
16. Miscellaneous.................................................................................................................12
Schedule 1 Definitions..............................................................................................................14
Schedule 2 Drawdown Payments..............................................................................................21
Schedule 3 Third Party Payments .............................................................................................22
Schedule 4 Budget ....................................................................................................................23
Schedule 5 .................................................................................................................................24

LT-000822

**AGREEMENT** dated 2015

**BETWEEN:**

(1) **Vandermolen Film Co. Ltd** (registered number 07994036), a company incorporated under the laws of England and Wales whose registered office is at 6 Hutchings Walk, London NW11 6LT, United Kingdom (the **Funder**); and

(2) **London Town Pic Limited** (registered number 08610109), a company incorporated under the laws of England and Wales whose registered office is at Suite 412 Gilmoora House, 57-61 Mortimer Street, London W1W 8HS (the **Borrower**).

**WHEREAS:**

(A) The Borrower requires the Funder to make available a bridge loan facility of up to a principal amount of US$1,794,000 (including the Facility Legal Fees and the Facility Arrangement Fee) (the **Facility**) to enable the Borrower to meet certain pre-production and production costs and expenses incurred or to be incurred by the Borrower in connection with the Film.

(B) The Facility may only be drawn by the Borrower on the dates, and in the amounts, specified in Schedule 2 unless otherwise pre-agreed in writing by the Funder.

(C) The Funder shall make the Facility available to the Borrower on the terms and conditions set out in this Agreement.

**NOW IT IS HEREBY AGREED** as follows:

Words and expressions defined in Schedule 1 of this Agreement shall have the same meaning when used in this Agreement.

1. **Availability and Drawdown**

1.1 Subject to the terms of this Agreement (including without limitation the terms of clause 1.2 below) and the Borrower's compliance with them and to all conditions precedent in this Agreement being fulfilled, the Primary Advance will be made in accordance with Schedule 2. No Advance shall be made which would result in the Facility being exceeded unless approved in advance in writing by the Funder.

1.2 The Funder shall have the option of providing the Primary Advance in stages in accordance with the Cashflow Schedule, instead of in accordance with Schedule 2.

1.3 The Borrower requests that the Primary Advance be paid to the Escrow Account, or in the event of the Funder exercising its option pursuant to clause 1.2, the Production Account, or otherwise (at the direction of the Borrower, hereby given) used to pay the Third Party Payments. The Borrower irrevocably and unconditionally agrees and acknowledges that all Advances from time to time credited to the Production Account will be held on trust for the Funder and may only be used in connection with the Film in accordance with the terms of this Agreement, the Budget and the Production Schedule.

2. **Currency of Facility**

The Facility shall be maintained and repaid in United States Dollars.

8437353-1

LT-000823

3. **Conditions Precedent**

3.1 The Funder shall not be obliged to advance any part of the Facility until the Borrower has supplied copies and/or confirmations of all of the following in a form satisfactory to the Funder:

3.1.1 a certified copy of the memorandum and articles of association (or equivalent constitutional document) of the Borrower and a board or member's resolution approving and authorising the execution by the Borrower of this Agreement and all other agreements referred to in this clause;

3.1.2 chain of title documents (together with evidence of any outstanding budgeted production chain of title payments) pursuant to which the Borrower is entitled to make and exploit the Film and thereby any copyright works incorporated therein throughout the world in perpetuity, including, without limitation, the Screenplay together with evidence that all payments have been made or will be made as required by and in accordance with such chain of title documents and confirmation from each of HG and WeatherVane that they have approved the chain of title documents subject to payment of any outstanding chain of the payments;

3.1.3 fully executed contracts with the key cast for the Film and the Director as specified in the Financiers' conditional commitments and/or Sales Agent's sales estimates including but not limited to details of availability dates, stop dates, pay or play and/or escrow requirements;

3.1.4 confirmation of any pay or play arrangements, escrow deadlines, participations, box office bonuses, deferrals and final cut rights agreed or in relation to which there are outstanding issues with key cast and crew together with details of any guilds involved in the Film and obligations owed to those guilds;

3.1.5 the identities of and fully executed contracts with the Individual Producers and Line Producer;

3.1.6 fully executed agreements from the Financiers in respect of their contributions to the Budget and evidence satisfactory to Funder that all the finance required for the Film (other than the Facility and the sums to be advanced under the WV Agreement) has been unconditionally and irrevocably paid by the Financiers to the Production Account or to the Escrow Account;

3.1.7 a fully executed finance agreement between WeatherVane, Forrest Capital Partners, Inc. and Adana Investing Inc, and a related bridge facility agreement between WeatherVane and Adana Investing Inc, in respect of the Film (together the **WV Agreement**) and confirmation has been provided by Wells Fargo Bank of the matching and posting of the funds advanced by Adana Investing Inc in accordance with the WV Agreement;

3.1.8 evidence that the Completion Guarantor, HG, WeatherVane, Individual Producers and the Sales Agent have approved the Budget, finance plan for the Film, Production Schedule and the Screenplay;

3.1.9 an executed version of the Completion Guarantee;

3.1.10 evidence or confirmation of the following, in a form satisfactory to the Funder:

(a) Budget, Cashflow Schedule and Production Schedule;

LT-000824

(b)      proposed expenditure of the proceeds of the Facility; and

(c)      summary weekly production cashflow requirements for the full pre-production, production and post-production period for the Film;

3.1.11    original copies of the Funder Security and resolutions of the Borrower approving and authorising execution of the relevant Funder Security to which it is a party;

3.1.12    a copy of the fully executed Sales Agency Agreement with the Sales Agent, updated sales estimates and a credible and satisfactory marketing plan for Toronto Film Festival and AFM in a form that is satisfactory to Funder;

3.1.13    a copy of the sales estimates for the Film;

3.1.14    evidence of all pre-sales made to date, including signed deal memos or long form distribution agreements;

3.1.15    details of the status of the UK film production tax credit application and a copy of the interim certification in respect of the Film;

3.1.16    an opinion letter regarding the UK film production tax credit from Borrower's accountant in a customary form which is to the Funder's satisfaction;

3.1.17    a fully executed copy of the Standstill Agreement;

3.1.18    executed versions of the inter-creditor agreements, security documents and collection agreement, all in respect of the Film;

3.1.19    Insurance Policies with Funder named as an additional insured on the Insurance Policies as follows: "Vandermolen Film Co. Ltd, its successors and assigns and the respective officers, directors, shareholders, employees, agents and other representatives of any and all of the foregoing" and evidence that the Insurance Policies will not be cancelled or materially amended without the Funder receiving 30 days' prior written notice.

3.1.20    such other documents and information as the Funder may in its reasonable commercial discretion require including, but without limiting the generality of the foregoing, in respect of any conditions required to be fulfilled by any Financier of the Budget prior to their finance being made available;

3.1.21    a search of the Companies House register showing the Borrower to be in good standing and free from Encumbrances; and

3.1.22    formal approval of the Facility by the investment committee of the Funder.

3.2    Notwithstanding Clause 3.1 above, if the Funder in its absolute discretion elects to advance any part of the Facility before all of the conditions precedent above have been satisfied, the Funder shall not be deemed to have waived such conditions which must still be satisfied as soon as practicable provided that the Borrower acknowledges that the Funder reserves the right to suspend the advance of any part of the Facility until such conditions have been satisfied. If in the Funder's opinion such conditions cannot or will not for any reason be met, then after Borrower's receipt of written notice thereof and expiration of the Cure Period, the Funder shall be entitled to demand repayment of any sums so advanced prior to the date of such demand.

LT-000825

4. **Interest, Premium and Arrangement Fee**

4.1 The Facility shall be free from interest up to and including the Cure Period Expiry Date. In the event that the Debt has not been indefeasibly repaid in full by the Borrower by the Cure Period Expiry Date, a default fee of 1.5% of any part of the Facility then outstanding shall be payable on the first Business Day following the relevant date of non-payment for each seven day week or part week thereof after the Cure Period Expiry Date in which the Facility and related premium or premia is not indefeasibly repaid in full.

4.2 The Borrower agrees to pay to the Funder a fixed premium on the Primary Advance in the amount of 10% of the Primary Advance, being US$179,400 (the **Premium**), and a further premium (the **Additional Premium**) on the Primary Advance in the amount of 1% of the Primary Advance for each seven day period (pro rata per diem) from the Eight Week Mark until the Cure Period Expiry Date in which the Facility and related premium or premia are not indefeasibly repaid in full. The Premium is payable on the Maturity Date and the Additional Premium is payable no later than the Cure Period Expiry Date.

4.3 For the avoidance of doubt, the Borrower agrees that the Premium shall be paid by the Borrower and shall form part of the Debt even if the Borrower does not request all of the Facility to be advanced.

4.4 The Borrower agrees to pay to the Funder an arrangement fee for the Facility in the amount of 5% of the Facility being US$89,700, on the Drawdown Date (the **Facility Arrangement Fee**) which shall be included in the Primary Advance and will be payable in accordance with Schedule 3.

5. **Repayment**

5.1 The Borrower agrees to repay the Facility and the related premium or premia in full without set off or deduction and free of Tax in United States Dollars on or before the Maturity Date.

5.2 For the avoidance of doubt, the Borrower's repayment obligation pursuant to clause 5.1 above remains in full effect whether or not sufficient funding is available pursuant to the WV Agreement for the purposes of making such repayment by the Maturity Date, and in the event that sufficient funding is not available pursuant to the WV Agreement, the Borrower shall repay the Facility and the related premium or premia in full without set off or deduction and free of Tax in United States Dollars on or before the Maturity Date using its own resources or any other sources of finance.

5.3 Such amounts will be repaid to the Funder's account at Barclays Bank PLC with such details as notified to the Borrower. In the event that the Borrower only makes a partial repayment of the Debt such payment shall first be applied towards any premium, premia and/or default fees before being applied towards reducing the balance of the outstanding Debt.

6. **Representations, Warranties and Undertakings**

6.1 The Borrower hereby represents warrants and undertakes and shall be deemed to repeat each such representation warranty and undertaking on each day that any part of the Debt remains to be repaid that:

6.1.1 it is a limited company in good standing duly incorporated and validly existing under the laws of England and Wales with the power to own assets and to carry on its business as currently conducted, that it is able to pay its debts as they fall due within the meaning of section 123 Insolvency Act 1986 and that it has the requisite power and authority and has taken all necessary corporate action to enable it to enter into

8437353-1                                                       4

LT-000826

and perform this Agreement and the agreements and transactions contemplated by this Agreement;

6.1.2 on execution by the Borrower, this Agreement will constitute a valid and binding obligation of the Borrower enforceable in accordance with its terms;

6.1.3 save for the Permitted Encumbrances no security interests exist over the undertaking, property or assets of the Borrower in relation to the Film or otherwise;

6.1.4 neither the acceptance nor the performance by it of any agreement relevant to the Film will contravene any law or other enactment or any judgment or other decision of any court or its constitutional documents or the powers of its directors or officers or any existing contract or document which is binding on it;

6.1.5 it shall fulfil all necessary terms and conditions in its agreements relating to the Film and will use all reasonable endeavours to complete the financing of the Film no later than the Maturity Date;

6.1.6 it is exclusively entitled to all rights required to make the Film (including but not limited to such rights in and to the Screenplay and all underlying material on which the Screenplay is based as are required to make the Film) and shall be so entitled in relation to all rights in and to additional work on the Screenplay and all other copyright works to be incorporated into the Film and will acquire all rights consents and waivers of rights necessary or desirable for the production distribution exhibition advertising and exploitation of the Film in all media throughout the universe for the full period of copyright protection;

6.1.7 no claim litigation arbitration or other proceedings are in progress (or to the best of its knowledge and belief, threatened or pending) against it or related in any way to the Film, the Screenplay or any other underlying rights to the Film and it has no actual or constructive notice of any defect in the Borrower's rights in the Film or any underlying rights in it;

6.1.8 to the best of the Borrower's knowledge and belief nothing contained in the Film or the Screenplay is or shall be obscene, libellous or defamatory or infringes or will infringe any right of copyright, or to the best of the Borrower's knowledge and belief having made due and careful inquiry any trade mark, patent, design right, registered design right, moral right, performer's right, right of privacy, right of publicity or any other right whatever of any third party;

6.1.9 all rights and clearances including without limitation those relating to any music on the soundtrack of the Film for use in conjunction with the Film and its exploitation in any and all media and out-of-context trailer use and other such clearances (excepting the rights controlled by the Performing Right Society Limited and other similar bodies) shall be obtained and, to the extent that such rights and clearances may be obtained under relevant union, guild and all like agreements, the payment of all sums due under such agreements shall be paid whether by way of advance royalty or residual payment necessary to enable the Film to be exploited in all media whether now known or after the date of this Agreement devised without any limit throughout all countries of the world;

6.1.10 the Film is not subject to the rules of any agreement with any US guild;

6.1.11 any net profit payment entitlement due to any talent engaged or to be engaged in connection with the Film will be paid by the Borrower or the collection account

LT-000827

manager from the Borrower's share of the net profit entitlement and shall not affect the net profits payable to the Financiers;

6.1.12    the information set out in this Agreement and all documents and other information supplied or to be supplied to the Funder by the Borrower is true and accurate in all material respects and that it has fully disclosed and shall hereafter disclose to the Funder all facts and information which it knows or ought to know are material to the Funder (having made due and careful inquiry) in inducing the Funder to enter into this Agreement and to make available the Facility and to the Funder's interests hereunder and it shall furnish to the Funder throughout the production of the Film (for so long as any part of the Debt remains outstanding) such financial or other information in relation to the production of the Film as the Funder may reasonably require including all cost reports;

6.1.13    the Budget is a complete and accurate estimate of the total cost of production of the Film and includes adequate provision for all costs and expenses relating to the Facility;

6.1.14    it will not make any payment in connection with the sunk costs (including but not limited to the Borrower's sunk costs) relating to the Screenplay or the Film, or the sales expenses of the Sales Agent, or producer's fees, producer overhead or any payments to the Borrower or any person partnership company or other entity associated with them prior to full and unconditional repayment of the Facility nor use any part of the Facility or any other advance of permanent finance from a Financier to repay the Borrower's debt in relation to pre-production or production financing from any other lender other than as set out in Schedule 3 as a Third Party Payment or as otherwise approved by the Funder;

6.1.15    it will not make any loans, or grant any credit or give any financial guarantee or indemnity or otherwise assume any liability in respect of, or jointly with, any other person nor use any part of the Facility in each case otherwise than in connection with the production and delivery of the Film in accordance with the Budget, the Production Schedule and the Screenplay for the Film as approved by the Funder;

6.1.16    no Event of Default has occurred and is continuing;

6.1.17    no Event of Default will result from the execution of this Agreement or the transactions contemplated by it;

6.1.18    it will not assign, novate, terminate or otherwise deal with or agree to any material alteration to any or all of the documents required to be approved by the Funder hereunder save with the prior written approval of the Funder;

6.1.19    it has not traded and will not trade or undertake any activities of any kind other than in relation to the Film and will not sell or dispose of any interest in the Film or the rights or materials related thereto save with the prior written approval of the Funder.

6.2    The signatory of this Agreement on behalf of each of the parties hereby respectively represents, warrants and undertakes that on his/her signature, this Agreement will constitute a valid and binding obligation thereof enforceable in accordance with its terms. Each of the parties hereto further represents, warrants and undertakes, respectively, that: (a) it is a duly organized, valid and extant company authorized to enter into and fully perform under this Agreement without the authorization or permissions of any third party; (b) there are no contracts, agreements or understandings which will or might conflict with its entering into and performing fully under this Agreement; (c) there is no existing (or, to the best of its knowledge and belief, threatened or

LT-000828

pending) claim, litigation, arbitration or other proceeding or Encumbrance which might adversely affect the parties' rights or obligations hereunder; and (d) entering into and performing this Agreement does not violate or infringe upon the rights of any third party.

7.    **Undertakings**

7.1    The Borrower undertakes for the benefit of the Funder that whilst any part of the Debt remains outstanding:

   7.1.1    it shall only apply or permit the application of the Primary Advance towards production spend (in accordance with the Budget) all in accordance with the terms of this Agreement, and it shall not grant or create any Encumbrance (other than the Permitted Encumbrances) in respect of, nor withdraw or permit the withdrawal of, such monies for any other purpose, save in each case with the express prior written approval of the Funder;

   7.1.2    it shall only apply or permit the application of all sums, other than the Advances, standing to the credit of the Production Account towards repayment of the Debt to the Funder in full, and it shall not grant any Encumbrance (other than the Permitted Encumbrances) in respect of, nor withdraw or permit the withdrawal of, such monies for any other purpose, save in each case with the express prior written approval of the Funder;

   7.1.3    it shall not exercise any right it may have to close the Production Account;

   7.1.4    in relation to all production (including cast and crew) agreements relating to the Film:

      (a)    the Borrower has entered into or will as soon as practicable enter into all agreements necessary for the production of the Film;

      (b)    all engagements of any member of cast and/or crew rendering services in respect of the Film are or will be within the financial and other terms required and stipulated by the Budget; all contracts will be in a form usual in the film industry and consistent with the reasonable requirements of the Funder; such contracts will contain a grant of rights to permit the widest legally permissible or otherwise commercially reasonable under the circumstances exploitation of the Film; such grant of rights will specifically include an assignment and an unrestricted authorisation of exploitation of all performer's rights (where applicable) including exploitation of the Film by means of rental and lending and the contracts shall include an acknowledgement that the payment provided for in the contracts includes an element representing equitable remuneration for the authorisation of rental and lending; all contracts for the production of the Film shall include a waiver of moral rights to the extent (if any) that such waiver is legally permissible;

      (c)    the Borrower shall not use any location, crew member or artist; or depict any living person in relation to the Film without entering into, as relevant, a location release agreement; a crew agreement; artist's agreement; or a release; and

      (d)    the Borrower shall not agree to or permit the termination, material waiver or variation from the standard form of any of the production agreements without the prior written consent of the Funder (not to be unreasonably withheld or delayed).

8437353-1                                    7

LT-000829

7.2    The Borrower undertakes that it shall:

7.2.1    ensure that the copyright in the Screenplay, and the copyright in the Film will be protected by registration pursuant to the applicable copyright statutes of the United States of America;

7.2.2    not while any part of the Debt is outstanding under this Agreement, sell, transfer or in any way dispose of all or any part of its undertaking or assets, nor create or permit to subsist any mortgage, charge (whether fixed or floating) or other security or possessory interest (other than the Funder Security and Permitted Encumbrances) upon any of its rights, undertaking or assets;

7.2.3    until the Debt has been indefeasibly repaid to the Funder in full, at the request of the Funder make copies available to the Funder of any and all conditions precedent and all agreements to be entered into after the date of this Agreement in connection with the provision of services or facilities employed in the production, completion and delivery of the Film and, prior to such agreements being concluded, the Borrower shall ensure (or, where it is not a party, it shall use all reasonable endeavours to procure) that the Funder's comments are taken into account in the negotiations of such agreement but only to the extent that such comments are relevant to the protection of the Funder's rights and entitlements under this Agreement;

7.2.4    until the Debt has been indefeasibly repaid to the Funder in full, keep full, complete, accurate and faithful books of account and records in the English language relating to the development, production, completion and delivery of the Film and the Borrower shall permit the Funder, at the expense of the Borrower, on reasonable prior written notice during normal business hours on any Business Day and either directly or through an appointed representative to inspect, take copies or extracts of and/or cause to be audited all such books of account and records;

7.2.5    until the Debt has been repaid indefeasibly to the Funder in full, promptly (and in any event with five (5) Business Days of preparation or receipt of the Debt, as the case may be) deliver to the Funder weekly statements of account relating to the Production Account and expenditure on the Film and such other information relating to the Film as the Funder shall reasonably require;

7.2.6    until the Debt has been indefeasibly repaid to the Funder in full, supply to the Funder on demand such financial and other information in relation to its activities and business as they relate to the production of the Film as the Funder may reasonably request and in particular that the Borrower will, until the earlier of completion of the production of the Film and the indefeasible repayment in full of the Debt, promptly deliver full statements of actual weekly costs compared with budget costs and an estimate of the cost to complete production of the Film;

7.2.7    notify the Funder immediately upon becoming aware of the occurrence of an Event of Default or a potential Event of Default;

7.2.8    not amend or permit the amendment of any of its constitutional documents without the express consent of the Funder;

7.2.9    until the Debt has been indefeasibly repaid to the Funder in full, ensure that representatives of the Funder are copied on all correspondence (including emails) regarding the interparty agreement (if any), the collection agreement (if any) and agreements to be concluded with the Financiers in relation to the Film and the permanent financing for the Film;

8437353-1                                          8

LT-000830

7.2.10      procure the maintenance of the Insurance Policies in respect of the Film and shall ensure that the Insurance Policies shall remain in full force and effect for the period of the Production Schedule and in the case of errors and omissions insurance for 3 full calendar years following the Delivery Date (with limits of not less than US $1,000,000 for any single occurrence and US $3,000,000 for all occurrences (or the sterling equivalent), with no exclusions whatsoever to operate until expiry of not earlier than 3 (three) years from the Delivery Date with a deductible of no more than US $10,000 (or the sterling equivalent)).

7.2.11      not do anything nor allow anything to be done whereby any of the Insurance Policies may be or become void or voidable or whereby any such Insurance Policies might be prejudiced, cancelled or avoided;

7.2.12      shall promptly pay or procure the payment of all premiums, calls, contributions, or other sums payable in respect of the Insurance Policies and produce all relevant receipts when so required by the Funder failing which the Funder may pay such premiums itself (in which case the Borrower shall on demand reimburse the Funder for the amount of such premium paid by the Investor failing which the Funder may deduct any such amounts from any amounts due to the Borrower under this Agreement);

7.2.13      shall upon becoming aware of the happening of any event giving rise to a claim under any insurances immediately give notice to the appropriate insurers and to the Funder.

## 8. Events of Default

If any Event of Default shall occur the Funder may, without prejudice to its other rights hereunder or under the Funder Security, terminate its obligation to make the Facility available and/or declare the Debt repayable immediately (or in accordance with such declaration).

## 9. Credit and Premiere

9.1      The Borrower will accord the Funder an on screen credit in the end titles of the Film on all copies of the Film in any media now known or invented in the future made by or to the order of the Borrower in the form **Bridge Finance provided by Vandermolen Film Co. Ltd**.

9.2      The Borrower shall accord the Funder 3 executive producer credits, to be nominated at the Funder's sole discretion, on the Film in the main titles of the Film on a shared card in substantially the form **Executive Producers (TBC), (TBC) and (TBC)** on a most favoured nations basis as to size, style, boldness, prominence and duration with all other executive producers of the Film.

9.3      The Borrower undertakes to procure that the Funder is provided with four tickets/invitations to the first US and UK celebrity premiere of the Film.

9.4      Except as expressly set forth herein, all other aspects of such credits to be at Borrower's sole and absolute discretion.

9.5      The Borrower will procure that all contracts with distributors and licensees of the Film require such distributors and licensees to accord such credit on copies of the Film in any media now known or invented in future made by them or to their order provided that the Borrower will not be liable for any inadvertent failure by such distributors and/or licensees to accord such credit.

LT-000831

The Borrower will however endeavour to remedy such failure on a prospective basis following notice in writing from the Funder without incurring any additional expenses and without being obliged to commence legal proceedings or to recall any prints or advertising materials. For the avoidance of doubt, no failure by the Borrower or any third party to accord such credit will entitle the Funder to an equitable remedy hereunder in connection with the Film, including, without limitation, the right to restrain, injunct or otherwise restrict the exploitation of the Film, any element thereof and/or ancillary right thereto and/or the advertisement, promotion publicity and distribution thereof.

10. **Notices**

Any notice required to be given under this Agreement shall be in writing and shall be delivered by personal delivery or sent by first class mail (all with a contemporaneous courtesy copy to be sent via email, it being agreed that such email copy shall not discharge the respective parties obligation in relation to serving notice in accordance with this Agreement) to the address of the party set out above or to such other address as the parties shall otherwise have notified to each other. In the case of personal delivery, notices shall be deemed received on the day of delivery except where delivered outside normal working hours or on a day which is not a Business Day when a notice shall be deemed received on the next working day. Notices sent by first class mail shall be deemed received in the case of international mail on the fifth (5th) Business Day after sending and otherwise within 48 hours. Facsimile notices shall be deemed received upon the sender's receipt of confirmation from the sender's machine of a successful transmission unless delivered outside normal working hours, in which case such a notice shall be deemed received on the next Business Day. Without prejudice to the foregoing a confirming copy shall be sent by 1st class mail but failure to send a confirming copy shall not invalidate the notice. Email copies for the Funder shall be sent to alastair.burlingham@outlook.com and for the Borrower tosofiasondervan@gmail.com and tom@culminationprod.com.

11. **Further Assurance**

The Borrower shall, at its own expense, furnish the Funder with all duly executed agreements documents or instruments (in such form as the Funder may reasonably designate) consistent herewith which the Funder may in its discretion reasonably require or deem necessary or proper to evidence establish protect enforce or secure any of the arrangements envisaged by this Agreement or more fully to put into effect the purposes provisions or intent of this Agreement. Should the Borrower within five (5) Business Days of its receipt of written notice of being requested so to do fail to furnish any such agreements, documents or instruments then, until the Debt has been indefeasibly repaid to the Funder in full, the Funder shall have the right to execute acknowledge and deliver the same on behalf of and in the Borrower's name and the Funder is hereby irrevocably appointed the Borrower's lawful attorney for such purposes, such appointment constituting a power coupled with an interest. Funder shall promptly furnish to Borrower with copies of any documents or instruments executed pursuant to the foregoing power of attorney, it being agreed that any failure so to do shall not be deemed a breach of this Agreement by the Funder,

12. **No Partnership**

Nothing herein shall constitute a partnership or a joint venture between the Funder and the Borrower and neither party shall hold itself out as the agent or partner of the other.

13. **Confidentiality**

The Borrower shall not without the prior written consent of the Funder disclose, reveal or make public (other than to its professional advisers, lawyers, any financiers of the Film or guilds

LT-000832

(should it be deemed necessary), on a strictly confidential basis, or as required by law) any information of whatever nature in connection with the business of the Funder coming into its possession during the course of the transaction contemplated by this Agreement or otherwise in connection with the Film or the terms of this Agreement all of which shall be treated by the Borrower on a strictly confidential basis.

14. **Assignment and Sub-Participation**

14.1    The Funder shall be freely entitled to assign in part or in whole the benefit of this Agreement, but not the obligation to fund, without regard to any set-off, counterclaim or equities between the Funder and the Borrower but the Borrower may not assign, the benefit hereof without the prior written consent of the Funder.

14.2    The Borrower acknowledges the right of the Funder to sub-participate or assign the Facility or the Debt to third parties at its discretion and the Borrower authorises the Funder to disclose such information and to supply such documentation, whether concerning the Borrower, the Film or otherwise, as may be required to complete such sub-participation or assignment.

15. **Expenses and Taxes**

15.1    Until the Debt has been indefeasibly repaid to the Funder in full, the Borrower shall pay to the Funder on demand all reasonable costs, charges and expenses (including stamp, registration or other duties, legal fees and VAT) properly incurred by the Funder in connection with the enforcement of, or the preservation of any rights in connection with the Facility and/or the Debt. The Borrower will also indemnify the Funder on an after tax basis against all costs, expenses (including legal fees), claims, losses, damages, liabilities or proceedings suffered or incurred by it as a result of an Event of Default or an uncured material breach of this Agreement by the Borrower. For the avoidance of doubt the legal fees relating to the Facility until the date of this Agreement (but not any legal fees incurred pursuant to this clause following the date of this Agreement), to be an amount not to exceed Ten Thousand Pounds (£10,000) plus VAT (**Facility Legal Fees**), shall be deducted from the Primary Advance and will be payable in accordance with Schedule 3.

15.2    All Taxes in respect of amounts due from the Borrower under this Agreement and in respect of any amounts paid or payable by the Borrower under this Agreement or the Funder Security shall be paid by the Borrower when due and in any event prior to the date on which penalties attach to such Taxes. The Borrower shall, on demand, indemnify the Funder in respect of all such Taxes, together with any interest, penalties and expenses payable or incurred in connection with any such Taxes.

15.3    The indemnity in Clause 15.2 shall not extend to:

15.3.1    amounts deducted or withheld pursuant to Clause 15.4 in respect of which an additional amount has been paid to the Funder; and

15.3.2    amounts in respect of Tax imposed on the overall net income or capital gains of the Funder by the jurisdiction in which the Funder is resident for tax purposes.

15.4    If at any time the Borrower is required by law to make any deduction or withholding from any amount payable under this Agreement, on account of Tax payable in connection with the Facility or for any other reason in connection with the Facility, the Borrower shall pay such additional amount as is necessary to ensure that the Funder receives a net amount equal to the full amount which it would have received had no such deduction or withholding been made, and the Borrower shall promptly deliver to the Funder receipts, certificates or other proof evidencing the amounts (if any) paid or payable in respect of any such withholding or deduction.

LT-000833

16.    **Miscellaneous**

16.1    No failure, delay or other relaxation or indulgence on the part of either party hereto to exercise any power right or remedy under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise or waiver of any power right or remedy preclude its further exercise or the exercise of any other power right or remedy.

16.2    The Funder may disclose to its professional advisers and any proposed assignee or transferee such information as is in its possession at any time relating to the Facility, the Borrower or the Holding Company or any Subsidiary of the Borrower or any Subsidiary of the Borrower's Holding Company.

16.3    Notwithstanding any other terms of this Agreement and subject to third party contractual obligations in connection with the Film, the Funder and/or its parent and/or any of its associated companies shall be entitled to advertise and promote, by any means now know or invented in the future, the Funder's specific involvement in the Film provided that any such advertisement and/or promotion shall be temporarily suspended at the reasonable request of the Borrower should such advertisement and/or promotion negatively interfere with the marketing campaign for the Film directed at the public.

16.4    Except as otherwise set forth in this Agreement, any right or power which may be exercised or any determination which may be made under this Agreement by the Funder may be exercised or made in its absolute and unfettered discretion and it shall not be obliged to give reasons therefor.

16.5    A certificate by any officer or other duly authorised official of the Funder as to the money and liabilities for the time being due or accrued from or by the Borrower pursuant to this Agreement or the amount of any sums owing pursuant to this Agreement shall save for manifest error be conclusive evidence in any legal proceedings.

16.6    Each of the provisions of this Agreement is severable and distinct from the others and if at any time one or more of such provisions is or becomes invalid, illegal or unenforceable the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

16.7    This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement and any signature received by fax or in pdf format will be deemed an original.

16.8    Unless expressly provided in this Agreement, no term of this Agreement is enforceable pursuant to the Contracts (Rights of Third Parties) Act 1999 by any person who is not a party to it.

16.9    This Agreement and the Addendum set out the entire agreement between the Funder and the Borrower in relation to the subject matter of this Agreement and consequently supersedes all previous agreements and understandings in connection with the provision of bridge finance for the Film between them. Each of the parties acknowledges and agrees that it has not been induced to enter into the Agreement by any representations or promises, in connection with this Agreement or its subject matter, which are not contained in this Agreement or the documents executed pursuant to it. Each of the parties agrees that except in respect of fraud, it shall have no right or remedy in respect of any other representation, warranty, promise or assurance save as contained in this Agreement or the documents executed pursuant to it. This Agreement may not be varied except in writing signed by both parties. The rights of the Funder under this Agreement are cumulative and may be exercised as frequently as the Funder considers necessary and no failure or delay on the Funder's part in exercising any such right shall operate as a waiver thereof and no waiver by the Funder of any breach default or non-compliance hereunder shall be

LT-000834

construed as a continuing waiver of the same or any other breach default or non-compliance hereunder or thereunder.

16.10   This Agreement and any non-contractual obligations or liabilities arising from or connected with it shall be governed by, and construed in accordance with, the laws of England and Wales, and the Borrower submits to the exclusive jurisdiction of the courts of England and Wales provided however that the Funder may commence and maintain any action against the Borrower arising under this Agreement in the courts of any other jurisdiction relevant to such claim. The Borrower irrevocably waives any objection it might have to the courts of England and Wales being nominated as the forum to hear and decide any proceedings brought before it and to settle any dispute which may arise out of or in any way in connection with this Agreement and agrees not to claim that the courts of England and Wales are not a convenient or appropriate forum for these purposes.

**IN WITNESS** whereof the Borrower and the Funder have executed and delivered this instrument as a Deed on the day, month and year first above written.

**EXECUTED** and unconditionally delivered   )
as a **DEED** by   )
**VANDERMOLEN FILM CO. LTD**   )
acting by one Director in the presence of :   )

**Witness:**

Signature:

Name:

Address:   **HARBOTTLE & LEWIS LLP**
Hanover House
14 Hanover Square, London W1S 1HP

Occupation:   Trainee Solicitor

**EXECUTED** and unconditionally delivered   )
as a **DEED** by   )
**LONDON TOWN PIC LIMITED** acting by one   )
Director in the presence of :   )

**Witness:**

Signature:

Name:

Address:

Occupation:

LT-000835

**Schedule 1**
**Definitions**

In this Agreement unless the context otherwise requires:

| | |
|---|---|
| **Advance** | means an advance under the Facility and **Advances** shall be construed accordingly; |
| **Budget** | means the budget for the Film in the amount of US$3,164,536 attached here to as Schedule 4 and hereby incorporated; |
| **Business Day** | means a day (other than a Saturday or Sunday) on which banks are open for business in London or in Los Angeles; |
| **Cashflow Schedule** | means the cashflow schedule for the Film attached as Schedule 5; |
| **Completion Guarantee** | means the completion guarantee relating to the Film issued by the Completion Guarantor in favour of Funder on or around the date of this Agreement; |
| **Completion Guarantor** | means European Film Bonds A/S; |
| **Cure Period** | means ten (10) Business Days from the date of the notice of the: (i) Event of Default; or (ii) other act or omission to be performed hereunder; |
| **Cure Period Expiry Date** | means the date falling eleven (11) Business Days after the Maturity Date; |
| **Debt** | means all amounts outstanding under this Agreement including, without limitation, any Advances under the Facility, the premia and default fees referred to in Clause 4 and the expenses referred to in Clause 15 (to the extent not forming part of the Facility); |
| **Delivery Date** | has the meaning given in the Completion Guarantee. |
| **Director** | means the director of the Film, being Derrick Borte; |
| **Drawdown Date** | means the date agreed between the parties on which, subject to the terms of this Agreement, the Funder will make available the Primary Advance to the Borrower pursuant to Schedule 2; |
| **Eight Week Mark** | means the date falling fifty six (56) calendar days from (and including) the date of first drawdown of any part of the Facility; |
| **Encumbrance** | means any mortgage, charge (fixed or floating), pledge, lien, hypothecation, option, trust, right of set-off or other third party right or interest (legal or equitable), assignment by way of security, reservation of title or any other security |

8437353-1                                                    14

LT-000836

interest of any kind or preferential right or arrangement to confer security, in each case howsoever created or arising or any other agreement or arrangement (including, without limitation, a sale and repurchase arrangement) having similar effect and proprietary claims of third parties of any kind and nature;

**Event of Default**     means the occurrence of any of the following events or circumstances at any time prior to the Debt being indefeasibly repaid to the Funder in full and if such event is curable, subject to the Cure Period:

(a)   if the Borrower fails to pay any money due to the Funder or to discharge any obligation or liability payable by it from time to time to the Funder;

(b)   if the Borrower fails to comply with any term condition covenant or provision of this Agreement;

(c)   if any representation warranty or undertaking from time to time made or deemed made to the Funder by or on behalf of the Borrower under any of the Transaction Documents is or becomes incorrect or misleading in a material respect, and the Borrower fails to remedy the underlying circumstances within 5 Business Days of the Funder's request to remedy the same;

(d)   an Insolvency Event occurs in relation to the Borrower and/or WeatherVane;

(e)   the Borrower and/or WeatherVane ceases or threatens to cease to carry on business or ceases to exist;

(f)   if production of the Film is abandoned or if (without the prior written approval of the Funder) there is any departure from the Budget or the Production Schedule or if there is the threatened occurrence or occurrence of any event which would or could materially affect the Borrower's rights over and in respect of the Film or of any event giving rise to a claim under any Insurance policy relating to the Film;

(g)   control of the Borrower (as defined in section 416 Income and Corporation Taxes Act 1988 or its relevant local legislation) passing to any person or group of persons whose control in the Funder's good faith opinion results in a material deterioration in the Borrower's creditworthiness or any disagreement or deadlock amongst the owners or managers of the Borrower occurring which the Funder believes in good faith may affect the Borrower's ability to meet its obligations under the Transaction Documents to

LT-000837

which it is a party;

(h) the Borrower and/or WeatherVane breaches any of the terms, conditions, representations, warranties or undertakings contained in any of the Transaction Documents or the occurrence of an event of default under any of the Transaction Documents or any failure by any party to make any payment due, payable, owing or outstanding pursuant to any of the Transaction Documents;

(i) any of the Transaction Documents ceases to be in full force and effect or is terminated (without the Funder's prior written approval) or any of the provisions of the Transaction Documents become illegal or unenforceable;

(j) any circumstances arise which in the Funder's opinion acting reasonably and in good faith do or will materially and adversely affect the security conferred or intended to be conferred on the Funder in connection with this Agreement including any invalidity, breach, repudiation or threatened repudiation of this Agreement or the Funder Security;

| | |
|---|---|
| **Escrow Account** | means the escrow account held by the Completion Guarantor in relation to the Film with the following account details: |
| | Client name - European Film Bonds |
| | Acct No - 01424807 |
| | Ref - London Town, Escrow Account |
| | IBAN - GB23COUT18009101424807 |
| | BIC/Swift code - COUTGB22 |
| | Sort Code - 18 00 91 |
| | Bank - Coutts & Co ; |
| **Facility** | has the meaning ascribed to it in Recital (A); |
| **Facility Arrangement Fee** | has the meaning given in clause 4.4; |
| **Facility Legal Fees** | has the meaning given in clause 15.1; |
| **Film** | means the feature film currently entitled *London Town*; |
| **Financiers** | means all the financiers of the film other than Funder; |
| **Funder Security** | means the English law security agreements dated on or about the date of this Agreement between the Funder and |

16

LT-000838

the Borrower to secure the obligations of the Borrower under this Agreement;

**HG**

Head Gear Films FN Limited of The Metrol Centre, Kirkhill Place, Kirkhill Industrial Estate, Dyce, Aberdeen, AB21 0GU trading from Ashley House, 12 Great Portland Street, London W1W 8QN

**Individual Producers**

means the individual producers of the Film, being Sofia Sondervan-Bild, Christine Vachon and Tom Butterfield;

**Insolvency Event**

an insolvency event occurs when:

(a) a person enters into any arrangement or composition for the benefit of the person's creditors or convenes a meeting of the person's creditors (or a nominee calls such a meeting or suspends or threatens to suspend making payments with respect to all or any class of its debts);

(b) a person submits to its creditors or any of them a proposal under part I Insolvency Act 1986;

(c) a person enters into or proposes any arrangement, scheme, compromise, moratorium or composition with any of its creditors (whether under part I Insolvency Act 1986 or otherwise);

(d) a person is the subject of a moratorium under Schedule AI Insolvency Act 1986;

(e) a person makes an application to the court in respect of a proposed compromise or arrangement with its creditors or any class of them under section 425 Companies Act 1985 or resolves to make such an application;

(f) a person is the subject of an administration order (whether interim or otherwise) or is subject to a resolution passed by the directors or shareholders for the presentation of an application for such an order or has an application for such an order presented or such an order comes into force or if a notice of intention to appoint an administrator or a notice of appointment of an administrator is filed with the court or if a resolution is passed by the directors or shareholders for the filing of either such notice or a meeting is convened for consideration of such a resolution;

(g) a person presents a winding up petition or has a petition for winding up presented against it and in either case the debt occasioning such petition is not discharged within seven (7) days or has a winding up order made against it or a liquidator or provisional

LT-000839

liquidator is appointed;

(h)    a person is the subject of a resolution for voluntary winding up (other than a voluntary winding up while solvent for the purposes of an amalgamation or reconstruction which has the prior written approval of the Funder) or a meeting of its shareholders is called to consider a resolution for winding up or notice is given to any person of the intention to propose such a resolution;

(i)    a person has an administrative receiver, receiver, trustee, or similar officer appointed in respect of all or any of its assets or the assets of any guarantor;

(j)    a person has a written demand for the payment of sums due served upon it in accordance with section 123(1)(a) Insolvency Act 1986 which is not settled or disputed;

(k)    a person is struck off the register of companies or otherwise ceases to exist;

(l)    a person suffers any distress, attachment or execution to be levied on or in respect of any of its assets or is or becomes unable to pay its debts as and when they become due within the meaning of section 123(1)(e) or 123(2) Insolvency Act 1986 (omitting the words "it is proved to the satisfaction of the Court that");

(m)    any order is made for or there occur proceedings constituting main proceedings in any member state of the European Union;

(n)    a person enters into or suffers or there occurs any analogous proceedings or events to those specified in this definition; or

(o)    analogous proceedings or events to those specified in this definition are instituted or occur in relation to a person elsewhere than in England and Wales;

| | |
|---|---|
| **Insurance Policies** | The E&O insurance policy, the production insurance policies and any essential element insurance policy, each for the Film; |
| **Line Producer** | means the line producer of the Film, being Victoria Goodall; |
| **Maturity Date** | means the date falling ninety (90) calendar days from (and including) the date of first drawdown of any part of the Facility; |

LT-000840

| | |
|---|---|
| **Permitted Encumbrances** | means the Funder Security or any other security agreement approved in in advance in writing by Funder, including the security agreements referred to in the Standstill Agreement; |
| **Premium** | shall have the meaning given in Clause 4.2; |
| **Primary Advance** | shall have the meaning given in Schedule 2; |
| **Production Account** | shall mean the accounts at Barclays Bank PLC: |

GBP

| | |
|---|---|
| Account name | BUSINESS FREE MT |
| Sort Code | 20-10-53 |
| Account number | 60648086 |

USD

| | |
|---|---|
| Account Name | LONDON TOWN PIC LIMI USD |
| Sort Code | 20-10-53 |
| Account Number | 68675811 |

| | |
|---|---|
| **Production Schedule** | means the production schedule for the Film dated 6 March 2015, subject to any amendments as agreed by the Funder in advance from time to time; |
| **Sales Agent** | means Cargo Entertainment LLC; |
| **Screenplay** | means the screenplay for the Film written by Kirsten Sheridan and Sonya Gildea and in the form of the draft dated 22 June 2015 subject to minor "on the floor" changes made due to the requirements of production and dialogue polishes made during rehearsals and principal photography of the Film; |
| **Standstill Agreement** | means the standstill agreement relating to the Film dated on or around the date hereof between Funder, Borrower, each of the Financiers, the Completion Guarantor, the Collection Agent and the Sales Agent. |
| **Subsidiary** and **Holding Company** | shall have the meanings respectively ascribed to them by the Companies Act 2006; |
| **Tax** | means any tax (including valued added tax), levy, impost, duty or other charge or withholding of a similar nature and any restrictions or conditions resulting in a charge (including, in each case, any related penalty or interest); |

8437353-1

19

LT-000841

| | |
|---|---|
| **Third Party Payments** | means the payments detailed in Schedule 3; |
| **Transaction Documents** | means this Agreement, the Funder Security, the Standstill Agreement and all those other agreements which form part of the conditions precedent or any agreement executed pursuant to this Agreement; |
| **WeatherVane** | means Weathervane Productions, INC. a Nevada corporation; |
| **WV Agreement** | has the meaning ascribed to it in Clause 3.1.7. |

References in this Agreement to any statute or statutory provision include any statute or statutory provision which amends, extends, consolidates or replaces the same, or which has been amended, extended, consolidated or replaced by the same, and shall include any orders, regulations, instruments or other subordinate legislation made under the relevant statute.

LT-000842

**Schedule 2**
**Drawdown Payments**

1.      US$1,794,000, which includes all applicable Third Party Payments (including the Facility Arrangement Fee and Facility Legal Fees), will be advanced on the Drawdown Date subject to (i) clause 3.2 above (ii) this Agreement having been fully executed and (iii) the Borrower having satisfied the required obligations under this Agreement (the **Primary Advance**).

LT-000843

**Schedule 3**
**Third Party Payments**


**The Facility Legal Fees**

**Harbottle & Lewis LLP**

Amount:                    £12,000
Bank:                      National Westminster Bank
                           North Audley St Branch
                           1-4 Berkeley Square House
                           London W1J 6BR
Sort Code:                 50-41-06
SWIFT Code:                NWBK GB 2L
IBAN Number:               GB87NWBK50410612465186
Account Number:            12465186

Account Name:              Harbottle & Lewis LLP Client Account


**The Facility Arrangement Fee**

**Vandermolen Film Co. Ltd**

Amount:                    US$89,700
Account Name:              Vandermolen Film Co. Ltd US$ Account (account details to be
confirmed by Funder)


For the avoidance of doubt it is acknowledged by the Borrower that the amount of any payment under this Schedule 3 will be treated as having been drawn down by and made to the Borrower for the purposes of this Agreement.


8437353-1                          22


LT-000844

**Schedule 4**
**Budget**

LT-000845

**Schedule 5**

**Cashflow Schedule**

LT-000846