# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.:  1:20-cv-21536-MGC

LONDON TOWN PIC LIMITED;
SOFIA SONDERVAN-BILD; and
THOMAS BUTTERFIELD,

     Plaintiffs,

-vs-

WELLS FARGO BANK, N.A., and
WELLS FARGO ADVISORS, LLC,

     Defendants/Third-Party Plaintiffs,

-vs-

VANDERMOLEN FILM CO. LTD., and
LEE VANDERMOLEN,

     Third-Party Defendants.
_____/

Esquire Deposition Solutions
Remote Proceeding
Zoom Videoconference

Monday, December 21, 2020
11:15 a.m.

VIDEOTAPED DEPOSITION OF SOFIA SONDERVAN-BILD,

Taken before Matthew J. Haas, Notary Public in and
for the State of Florida at Large, pursuant to Notice of
Taking Deposition in the above cause.



Q.    Okay.  I'm going to start going through some documents with you.  Some of them will be documents you may have seen as part of Mr. Butterfield's deposition.  I'll give you an opportunity to read whatever you want, but I also don't want to slow you down, so if you've seen stuff and you know the document, let me know, and we can kind of jump ahead with the questions. Okay?

A.    Okay.

MR. BRODSKY:  Read everything, Sofia, please.

BY MR. SITTER:

Q.    You should see on your screen now a document that's been marked as Exhibit 38.  It's an email, it looks like, from you to Lynn Appelle dated February 18, 2015.  Do you see that?

A.    I do.

Q.    And it's titled update on payments for Urge, and you wrote, "Aaron told me there was money coming from Weathervane on February 9th. I heard today that this is not true.  I don't know what money they are getting, but we have lost our union deal, which is irreparable."

So I wanted to ask some questions



about this document.  Just to orient in time, this is February of 2015, and is it your understanding that at this point Urge was experiencing difficulties getting the funding for that production?

A.     Yes, absolutely.

Q.     Okay.  And was it your understanding that part of the funding that they were having trouble getting was funding that was due to Weathervane?

A.     To be honest, I never got any clear answer on anything from anyone associated with Urge, which was part of my frustration.  So a lot of my emails were just probing to get information.

Q.     Okay.

A.     So I'm not sure is the answer.

Q.     Okay.  But it looks like, and tell me if I'm wrong, please, but you're talking here about Aaron telling you that there was money coming from Weathervane.  Is it your understanding that money from Weathervane was for the production of Urge, correct?

A.     That's correct.

Q.     So you at least understood that



acknowledged that there was 1.1 in the bank, and that Prescience took out 900,000.  He said that money was taken out because of Weathervane."  Can you explain to me what you meant by that, he said that money was taken out because of Weathervane.

A.    I don't know.  I don't remember.

Q.    Okay.  So -- go ahead.

A.    I don't remember what that meant, I don't really remember this conversation even.

Q.    Okay.  And then he goes on and he also said the Weathervane money had not come in and was two months late.  So again, the email is dated April 14, 2015.  Given that statement, is it fair to say that you knew as of that date that the funding that Weathervane was supposed to provide to Urge was at least two months late?

A.    It's fair to say that I didn't know or like or trust any of these people, because they were -- had screwed up my union deal, so I'm just relaying here what this guy said, whether he was telling the truth, I didn't know, because I was also told that Prescience was holding back money, so I was relaying here what he said.

Q.    Let me try the question a different way that doesn't require you to buy into what



you noted that Lejsak had asked if she meant an injunction?

A.    I don't know.  I don't remember what that means.

Q.    Okay.  Are you aware of Prescience ever bringing a legal action against Urge?

A.    I think I was told that they were going -- oh, again Urge, no, no.

Q.    What about against Weathervane?

A.    I think I was told that they were going to take legal action against Weathervane, but I never -- I never saw, you know, no one ever showed me anything further about that, but I think that somebody told me.

Q.    When did you learn that or hear, I guess, that Prescience intended to take legal action against Weathervane?

A.    I think at the end of 2015 sometime.

Q.    Okay.  So I believe that London Town executed the financier term sheet with Weathervane on or about June 18, 2015.  Does that sound right?

A.    Possibly, yeah.

Q.    Prior to executing that agreement, did you make any further inquiries to see whether



A.    That's right.

Q.    Okay.  Would it be fair to say, though, that Weathervane's lateness in providing funding for Urge had a negative impact financially on you?

A.    I didn't think this was all hanging behind Weathervane.  I really didn't understand how their finances worked, and no one ever told me how they worked, so I would say I just -- I knew Weathervane was part of their financing.

Q.    Okay.

A.    But I didn't -- I didn't understand their financing and no one ever really told me.

Q.    Okay.  Let me try it a different way.  So you understood that Weathervane was a part of the financing for Urge, and you understood that the problems with the financing for Urge have resulted in financial harm to you; is that fair?

MR. BRODSKY:  Object to the form.

THE WITNESS:  I understand that --
I think that the financing of Urge not coming through from wherever it was coming from caused them not to pay the union fees which directly impacted me, yes.



BY MR. SITTER:

Q.    In a negative way, correct?

A.    In a very negative way.

Q.    Okay.  And while you may not understand all the intricacies, you at least understood that Weathervane was involved in the financing for Urge?

MR. BRODSKY:  Object to the form.

BY MR. SITTER:

Q.    Correct?

A.    I really need to be clear about this.  I didn't know how their financing worked. I didn't know if Weathervane was the first round, the second round, the third round.  They had so many rounds of financing from what I understood, I didn't know who sat where.

Q.    Okay.  But you understood that Weathervane was supposed to provide money for the production of Urge, correct?

MR. BRODSKY:  Object to the form.

THE WITNESS:  I didn't know that at first, no.

BY MR. SITTER:

Q.    At some point you developed that understanding, though?



move to strike.  It was Exhibit No. 32, knowingly being used in violation of court order.

THE WITNESS:  No, not specifically.

BY MR. SITTER:

Q.    Okay.  Did you have discussions with Tom on or around November 11, regarding a lawsuit filed by -- well, any lawsuit filed against Weathervane?

MR. BRODSKY:  Objection to form, move to strike, covered in previous deposition in knowing violation of court order.

THE WITNESS:  I think he had forwarded me some correspondence about it.

BY MR. SITTER:

Q.    What correspondence did he forward you about it?

A.    Like legal documents that have been filed.

Q.    What legal documents did he forward you that have been filed?

A.    I don't remember, and I certainly didn't review them, but I did forward them to our lawyer.



ESQUIRE
DEPOSITION SOLUTIONS

Q.    Okay.  So you were aware that legal documents had been filed in a lawsuit against Weathervane as of November of 2015, correct?

A.    I don't know if it was that date, but around that date, sure.

Q.    Okay.

A.    And I also think I knew that it was Adana that filed them.

Q.    And you -- and you sent those documents to your attorneys; is that correct?

A.    That's correct.

Q.    Okay.  How many -- approximately how many documents did you send to your attorneys?

A.    I don't know, but certainly one.

Q.    Okay.  Did you have any discussions with anyone regarding the allegations in the lawsuit that you just discussed?

MR. BRODSKY:  Don't disclose communications you had with your attorneys.

THE WITNESS:  Then only with Tom maybe.

BY MR. SITTER:

Q.    So apart from your attorneys, the only person or persons that you spoke with regarding the Adana litigation was Tom



Butterfield's deposition earlier this morning which you sat in.

The text of the message says, "Scary reading," and then there's an attachment, which if you scroll down, it's the declaration of Mark Trottier in the Adana and Weathervane and Forest Capital lawsuit.  Do you recall receiving this document from Tom Butterfield?

A.    I did when I did my search.

Q.    What did you understand him to mean when he said "Scary reading"?

A.    I think it was the lawsuit from Adana to Forest Capital or Weathervane, meaning, you know, something is wrong with this company, read this, and I forwarded it to my lawyer right away.

Q.    Okay.  So you understood his message to communicate to you that there was a problem with Weathervane; is that accurate?

A.    Yeah, or Forest Capital, which he explained to me, which I actually didn't know was part of Weathervane or associated with Weathervane.

Q.    Okay.  And did you read the document that was attached?



800.211.DEPO (3376)
EsquireSolutions.com

he's been reading emergency documents to freeze all the accounts both for the company and Jason and Ben's personal accounts, so was it your understanding that the Weathervane accounts were being frozen?

MR. BRODSKY:  Object to the form.

THE WITNESS:  No, that their personal account -- that their -- yeah, maybe like their personal bank accounts and maybe their company accounts, but our money was not in their account.  As far as we knew, it was in a Wells Fargo account.

BY MR. SITTER:

Q.    Money that you're referring to as "our money" --

A.    Sorry, not our money, the match money.  Let's be specific, the match money.

Q.    Okay.  You said you believed it was in a Wells Fargo account in whose name?

A.    I don't know in whose name.

Q.    Okay.

A.    I assume that Vandermolen -- I believe as part of the agreement, Vandermolen was supposed to be a signatory to that account.

Q.    Okay.  Did you -- did you --



A.    But we were not a party to this document, so I -- I don't know if that ever happened, but I remember that was one of the conditions.

Q.    Okay.  You, meaning Weathervane -- I'm sorry, no, not that.  Strike that.

You, meaning London Town, were not a party to the funding agreement between Weathervane and Adana, is that what you mean?

A.    That's correct.

Q.    Okay.  Had you seen that funding document prior to this date and time?

A.    I don't recall.

Q.    Okay.  So sitting here today, you're not sure one way or the other whether you had seen the funding agreement between Weathervane and Adana as of November 2015?

A.    Yes, I don't remember.

Q.    Okay.  And you respond, "If you Google that guy, he doesn't exist, sounds like major fraud."  So is it fair to say it was your conclusion or at least suspicion that there was a major fraud going on at this point in time?

MR. BRODSKY:  Objection to form.

THE WITNESS:  I was worried that



BY MR. SITTER:

Q.    Okay.  Did you or London Town have any bank accounts at Wells Fargo?

A.    No.

Q.    What banks did London Town use?

A.    Barclays.

Q.    Was that the only one?

A.    That was the only one.

MR. SITTER:  I don't have any further questions at this point.  Thank you for your time.

THE WITNESS:  Does anyone else have a question?

MR. BRODSKY:  No.

MR. SITTER:  Get out while you can.

MR. BRODSKY:  Both Tom and Sofia will read, but we're not ordering.

MR. SITTER:  We'll order.

THE COURT REPORTER:  Mr. Sitter, do you want the video?

MR. SITTER:  Not at this point, no. Can I get a time frame on the transcript, please?

THE COURT REPORTER:  It's usually ten days.  Did you need it any particular



CERTIFICATE OF OATH

BY NOTARY PUBLIC

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that SOFIA SONDERVAN-BILD remotely appeared before me and was duly sworn.

WITNESS my hand and official seal this 21st day of December, 2020.

MATTHEW J. HAAS
Court Reporter
Notary Public
Commission No. GG071012
Expires:  February 8, 2021



COURT REPORTER'S CERTIFICATE

I, Matthew J. Haas, court reporter in and for the State of Florida, certify that I was authorized to and did stenographically report the deposition of SOFIA SONDERVAN-BILD; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 21st day of December, 2020.



MATTHEW J. HAAS
Court Reporter