# EXHIBIT 42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: 20-21536-Civ-COOKE/GOODMAN

LONDON TOWN PIC LIMITED,
et al.,

      Plaintiffs,

 vs.

WELLS FARGO BANK, N.A.,
WELLS FARGO ADVISORS, LLC,

      Defendants.

_____

VIDEOTAPED RULE 30(B)(6) DEPOSITION OF
LONDON TOWN PIC LIMITED
THOMAS BUTTERFIELD

Taken on Behalf of the Defendants

DATE TAKEN:   Wednesday, September 23, 2020

TIME:          11:35 a.m. - 4:25 p.m. EST

LOCATION:    Via Videoconference

Examination of the witness taken stenographically
before:

Matthew McKinney, FPR



Mr. Vandermolen or Mr. Burlingham made to you in connection with those conversations?

A.   I'm sorry.  I don't understand.  Can you repeat the question?

Q.   Sure.  Did you rely upon statements made to you by Mr. Vandermolen in connection with procuring the bridge financing?

MR. BRODSKY:  Objection to the form.

A.   Yes.

Q.   Okay.  Describe for me what statements you relied upon.

MR. BRODSKY:  Objection to the form.

You can answer.

A.   Okay.

Well, the -- Vandermolen had the necessary funds to complete a bridge loan contract.

Q.   Did Mr. Vandermolen make any representations to you regarding WeatherVane?

A.   Yes.

Q.   Okay.  And what representations did Mr. Vandermolen make to you regarding WeatherVane?

A.   That he and Alastair had had multiple phone calls and a couple of physical meetings in Florida, where they had gone and done due diligence on the WeatherVane model, and that they felt comfortable that



that model would be successful and, therefore, they'd be willing to give us a bridge loan.

Q.   Is that the totality of information that Mr. Vandermolen gave you regarding what you just described?

MR. BRODSKY:  Objection to the form.

A.   Yes.  I'd say between -- yes, between phone calls, e-mails that they had with WeatherVane, and as I said, they had had a handful of meetings in Florida, yeah.

Q.   Where were those meetings in Florida?

A.   I believe in Miami and Fort Lauderdale, I believe.

Q.   And when did he tell you about those meetings?

A.   After they had happened.

Q.   Okay.  Can you be more specific?

A.   In terms of dates?  No.  I can just tell you I know that they had had them after --

Q.   Do you know when those meetings occurred?

A.   Yeah, I believe they were spring of 2015.

Q.   Do you believe that you were told about those meetings in the spring of 2015?

A.   Yes.

Q.   Okay.  Did he tell you where those meetings took place?



A.    He had mentioned various Wells Fargo branches, I believe at least a couple.  I know one was offsite.  I don't know exactly where.

Q.    Okay.  Did he tell you who attended those meetings?

A.    Yes.  He had met with a gentleman called Benjamin Rafael from Wells Fargo Bank, at at least one.  And he mentioned a gentleman called Paul Zoch, I think is how you pronounce his name, from Wells Fargo Advisors, at at least another.

Q.    And he told you those names in the spring of 2015?

A.    Yeah, correct.  I was aware of Benjamin Rafael's name previous to that.

Q.    How did you know Benjamin Rafael's name previous to that?

A.    Well, so WeatherVane had financed a film of mine called -- originally it was called Life at These Speeds, but then it became called 1 Mile to You.

Q.    And was Mr. Rafael -- how was Mr. Rafael's name associated with the 1 Mile to You film?

A.    He was the, quote, unquote, Wells Fargo representative.

Q.    Had you ever spoken to Mr. Rafael?

A.    I don't believe I ever spoke to him on the



LONDON TOWN PIC LIMITED 30B6                          September 23, 2020
LONDON TOWN PIC vs WELLS FARGO BANK                               113

minutes.

(Recess from 2:04 p.m. to 2:10 p.m.)

THE VIDEOGRAPHER:  Thank you, everyone.  We are now back on the video record at 2:00 and 10 minutes, eastern time.

Attorney Shaw, please continue.

BY MR. SHAW:

Q.   Mr. Butterfield, did you consider Vandermolen to be your fiduciary?

MR. BRODSKY:  Objection to the form.

A.   I'm sorry.  I don't understand.  What do you mean by --

Q.   Paragraph 76 of the currently operative complaint, "As agents of and financing arrangers for Plaintiff London Town and members, Plaintiff Sondervan and Butterfield, Adana and Vandermolen and their principals owed fiduciary duties to Plaintiffs."

Do you see that?

A.   I do see that, yeah.

Q.   Do you agree with that?

MR. BRODSKY:  Objection to the form.

A.   If it's there, yes, I do agree with it.

Q.   All right.  Did Mr. Vandermolen ever make representations to you regarding the legitimacy of WeatherVane?



Yeah, okay.

Q.    Okay?

A.    Yep.

Q.    First, it talks about an October 30th, 2014, meeting.  Do you see that?

A.    I do.

Q.    Okay.  Did you attend that meeting?

A.    I did not.

Q.    Okay.  Who told you about that meeting?

A.    Lee and/or Alastair.

Q.    Okay.

A.    To my understanding, they had done this trip together, Alastair Burlingham and Lee Vandermolen.

Q.    Did you talk to representatives of Adana about it?

A.    As I mentioned before, I've never spoken to anyone at Adana, so no.

Q.    Okay.  So the totality of your knowledge with respect to this alleged October 30th, 2014, meeting came from either Lee or Alastair?

A.    That's correct.

Q.    Okay.

A.    I would say the same for all of these meetings, just so...

Q.    Okay.  That will shortcut it.  So any meetings



described in this paragraph 24 of the amended complaint, the totality of your information was provided by either Lee or Alastair?

A.    That's correct.

Q.    Okay.  Do you recall reviewing a May 12th, 2015, letter from -- that Wells Fargo Bank provided?

A.    In regards to Adana, yes.

Q.    Okay.  When do you recall reviewing that letter?

A.    The exact date, I couldn't tell you.

Q.    Can you say if it was in or around May of 2015?

A.    It would have been, yeah.

Q.    Okay.  Do you recall reviewing a June 18th, 2015, letter that's alleged that Wells Fargo Bank provided?

A.    Yes.

Q.    And do you recall when you reviewed that letter?

A.    Again, it would have been around the same time.

Q.    Do you recall reviewing a June 2nd, 2015, e-mail that Rafael sent to Adana?

A.    Yes.

Q.    Okay.  Now, who provided you a copy of the May



settlement only dealt with the Adana matching side and that London Town Pic still owed all of its monies in regards to the bridge deal.

Q.   Did you ever review the Vandermolen complaint that was filed against Wells Fargo?

A.   No.

Q.   You never saw it?

A.   I don't think so, no.

Q.   So you weren't aware that London Town was specifically referenced in the allegations related to the claims that Vandermolen was making against Wells Fargo?

MR. BRODSKY:  Objection to the form.

A.   No.  I was only aware that Vandermolen had sued Wells Fargo after it happened, so no, I was not aware.

Q.   Is London Town seeking lost profits in connection with the damages in this case?

A.   I believe so, yes.

Q.   Okay.  How much equity does London Town Pic still have in -- insofar -- strike that.

You have 5 percent personally of the net profits of the film; correct?

A.   That's correct.

Q.   Do you know how much Ms. Sondervan-Bild has?



A.   I believe it's 5 percent as well, but you would have to double-check her producing agreement.

Q.   Okay.  And is there any percentage that London Town Pic holds?

A.   As an entity?

Q.   Yes.

A.   Not to my knowledge.

Q.   Okay.  So all of the other net profit would be distributed to the investors of the film; is that accurate?

A.   And also creatives, leading actors, director, writer, those type of...

Q.   Right.  But you would agree there's 100 percent that can be distributed of net profit; right?

A.   Yes, correct.

Q.   And London Town Pic itself isn't entitled to any of those net profits, is it?

A.   Again, I don't believe so, no.

Q.   Well, if you wouldn't know, who would?

A.   The collection account would state what the net profit percentages are.

Q.   Did you review that to prepare for today's deposition?

A.   The CAMA?  I did not.

Q.   You do understand that you have been



identified to testify as to damages that London Town's pursuing in this case; correct?

A.   I am.

Q.   Okay.  In the response to interrogatory, it says, "Plaintiffs will prove up the lost profits caused by Defendants' torts through expert witness testimony."

Are those lost profits that London Town Pic is trying to prove?

A.   Well, the plaintiffs include Sofia, myself and London Town, so it's a...

Q.   So you interpret that to mean yourself and Sofia individually?

A.   I believe so, yeah.

Q.   Okay.  I'm going to show you -- on the subfile, tab 28, I'm going to mark this as Exhibit 28.

(Defendants' Exhibit 28 marked.)

Do you recall providing responses to the -- similar questions for you individually?

A.   Yes, I do.

Q.   Okay.  And again, that's your signature at the bottom?

A.   Again, it's electronic, but yes.

Q.   Okay.  Now, these relate to damages that -- I think we talked about the London Town ones -- that you in your own capacity are seeking in this case; correct?



A.   Yep.

Q.   Okay.  First is a deferred production fee. That's the flat fee that you were entitled to that's been deferred, correct, that we talked about earlier?

A.   Correct.

Q.   Okay.  Is this still sitting in the bank account with Barclays?

A.   Again, I need to double-check.  I actually possibly misspoke.  I think that those fees have actually been sent to Vandermolen as part of repayment.

Q.   Okay.  Loss of gross receipts, $45,000.  Is that the -- what does that refer to?

A.   So that is the additional producing fees that I was supposed to get.

Q.   So that was a flat fee, the producing fees, that were deferred?

A.   Of my 75, yes, that's correct.

Q.   Okay.  So what's the difference between -- so why is it listed as loss of gross receipts?

A.   That must be a -- that must be an incorrect entry.

Q.   So what should it say?

A.   That would be part of my deferred production fees.

Q.   Okay.  Then what is this deferred -- I'm



trying to understand the difference between A and B.

A.   No, sorry, it should be the same thing.

Q.   So should the total be 45 plus 17,500?

A.   Yes, I think that's right.

Q.   Do you think or do you know?

A.   I think.  I need to double-check.

Q.   Okay.  Did you double-check before you signed this document?

A.   Clearly not enough.

Q.   Okay.  So A and B should be one entry, and you need to double-check what that amount would be?

A.   That's correct.

Q.   So we talked earlier about your loss of back-end net profits?

A.   Yeah.

Q.   I thought you said it was 5 percent.  Is it 4 percent?

A.   I thought it was 5 percent too, but if it says 4 percent, then that would be accurate to my producing agreement, so yeah.

Q.   Okay.  Is that what we were talking about earlier, that you thought would be -- or you did some calculations, and you thought it would be about $45,000?

A.   Yes, that is where I misspoke.  The 45 that you have in line B is actually my deferred production



fee.  What my net profit would be, I don't know.

Q.   Have you tried to get an estimate of what your net profit would be?

A.   No, because the film was never financially successful.

Q.   Okay.  But didn't we spend a bunch of time talking about the calculations that you did to figure out your net profit earlier?

A.   That's correct.  Again, I misspoke.

Q.   You misspoke, so you never did that calculation?

A.   No, I did not.

Q.   Okay.  You claim that you have reputational damages?

A.   That's correct.

Q.   How will you prove reputational damages?

MR. BRODSKY:  Objection to the form.

A.   How will I prove it?

Q.   Yes.

A.   I assume by bringing witnesses of people who are also part of my industry, that knew that I was a part of this.

Q.   Has anybody refused to work with you as a result of your involvement with London Town?

A.   No.



Fargo while it was going on; that is, was Lee Vandermolen telling you what was happening in the litigation?

A.   No.  He was very -- I guess in retrospect very understandably, very cagey.

Q.   I'm going to show you -- you had been shown an allegation from a -- from the amended complaint.  Do you know what a fiduciary is?

A.   That word specifically, I'm afraid I don't.

Q.   Okay.  And when Mr. Shaw had asked you whether you agreed with this allegation, can you explain what you meant by that?

A.   I meant that I had put into layman's terms to my lawyer what that meant, and he had put it into more, I guess, legal vernacular.

Q.   Okay.  Did you -- but you don't specifically know what a fiduciary is; correct?

A.   That's correct.

Q.   Did you rely on the conversations that Lee Vandermolen had relayed to you, with respect to the meetings at Wells Fargo Bank and Wells Fargo Advisors, in deciding to proceed with the WeatherVane financing?

A.   Absolutely.  I mean, it was his money, so if he was happy with it, then there's no reason why we wouldn't be happy with it.



Q.   And notwithstanding that you had earlier relied on the due diligence of the bonding company and of Ingenious, did you also rely on what Mr. Vandermolen and Mr. Burlingham had told you about those meetings?

A.   Absolutely.

MR. BRODSKY:   That's it for me.

MR. SHAW:   A few questions on redirect.

REDIRECT EXAMINATION

BY MR. SHAW:

Q.   You say, for paragraph 76, you put the words in layman's terms and your lawyer put them in a -- the language that appears in the complaint.  Is that your testimony?

A.   Yes, that's correct.

Q.   What were the layman's terms you used?

MR. BRODSKY:   I'm not -- he's not going to testify about what he told me.

BY MR. SHAW:

Q.   Well, what was your understanding of your -- of London Town and your and Sofia's relationship with Vandermolen?

A.   Sorry.  Can you -- something just popped up on my screen.  Can you repeat the question?

Q.   Yeah.  What was your understanding of your and Ms. Sondervan-Bild's relationship with Vandermolen?



A.    We had a bridge loan financing agreement with him.

Q.    I'm trying to understand how your layman's terms ended up representing that Adana and Vandermolen owed fiduciary duties to Plaintiffs.

MR. BRODSKY:  I'm objecting, and I'm instructing the witness not to answer.

BY MR. SHAW:

Q.    Did you -- what's your understanding of an agent?

A.    In the context of number 76?

Q.    Yes.

A.    Sorry.  I was just reading it again.

MR. BRODSKY:  I'm going to object to the form as well.

THE WITNESS:  My understanding, they were parties to agreements with us.

BY MR. SHAW:

Q.    Okay.  Are you aware that Wells Fargo has filed a third-party complaint in this action against Lee Vandermolen and Vandermolen Film?

A.    I've been made aware of that, yes.

Q.    Do you understand that part of the request for relief in connection with that third-party complaint is to have the bridge loan between London Town and



CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF DUVAL  )

I, MATTHEW McKINNEY, Florida Professional Reporter, Notary Public, State of Florida, certify that THOMAS BUTTERFIELD personally appeared before me via videoconference on September 23, 2020, and was duly sworn.

Signed this 2nd day of October, 2020.

_____

Matthew McKinney, FPR
Notary Public, State of Florida
Commission No.:  GG 099111
Expires: June 9, 2021

MATTHEW MCKINNEY
MY COMMISSION # GG 099111
EXPIRES: June 9, 2021
Bonded Thru Notary Public Underwriters

Personally Known_____

Or Produced Identification___X___

Type of Identification Produced___DL___



CERTIFICATE OF REPORTER

STATE OF FLORIDA )

COUNTY OF DUVAL  )

I, MATTHEW McKINNEY, Florida Professional Reporter, do hereby certify that I was authorized to and did stenographically report the videotaped deposition of THOMAS BUTTERFIELD, that a review of the transcript was requested, and that the foregoing transcript is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 2nd day of October, 2020.



_____
         Matthew McKinney, FPR